STATE, Respondent, v. WATKINS, Appellant.*

*No. State 60. Argued June 7, 1968.—Decided June 28, 1968.*
(Also reported in 159 N. W. 2d 675.)

---

* Motion for rehearing denied, without costs, on September 6, 1968.

For the appellant there was a brief and oral argument by *Kenan J. Kersten* of Milwaukee.

For the respondent the cause was argued by *E. Michael McCann,* assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *David J. Cannon,* district attorney.

ROBERT W. HANSEN, J.   This appeal is from the trial court's ruling that testimony would not be admitted as to occasions over a nine-year period of time on which defendant furnished information to law enforcement agencies, any such testimony to be limited to incidents or information involving the May 5, 1964, robbery. Defendant did not deny his participating in part in the holdup of the food store. However, he contends that he participated solely in order to secure information and deliver such information to the police. He contends that testimony concerning scores of prior, separate and disconnected occasions on which he gave helpful information to the police and FBI would have identified him as a "police informer" and given ". . . a plausible explanation for his conduct."

Since the term, "police informer" appears a half-dozen times in defendant's brief, it might be well to begin with a definition of the term, distinguishing it from certain other forms of citizen participation in law enforcement

work. It is an emotion-laden term that triggers different reactions from different people. With some the reaction is affirmative. With others, it is negative. The book and movie, "The Informer," dealing with the Irish war for independence, portrayed the police informant as an unlovely character indeed. In the ranks of the organized crime syndicate, the code of omerta (Death to the Informer) singles out the individual who furnishes information to the police for early demise. However, under our form of government, the citizen who gives helpful information to the police deserves neither scorn nor contempt. In fact, it is an affirmative responsibility of good citizenship to give to police authorities information concerning crime and criminals. Upon such citizen cooperation with the police, good law enforcement depends.

A legal definition of the term would go no further than:

*"Informer:* Anyone who gives information on criminal activities to a law enforcement agency."

Such definition carves out no special category of citizens. One who gives information to the authorities concerning crimes and criminals does no more than what every citizen is expected to do. It is true that this court has upheld the right of the police to protect the identity of citizen informants.[1] This is solely intended to protect those who cooperate with the police from the fact or fear of underworld retribution. Such decisions are not to be read as giving any unique status, rights or privileges to information-giving citizens.

One who gives helpful information to a law enforcement agency does not become by that fact alone an agent

---

[1] "Regardless of the informer's motive, he is entitled to protection for 'himself and his family from harm . . . .'" *Stelloh v. Liban* (1963), 21 Wis. 2d 119, 125, 124 N. W. 2d 101. *See also Roviaro v. United States* (1957), 353 U. S. 53, 59, 77 Sup. Ct. 623, 1 L. Ed. 2d 639 and *McCray v. Illinois* (1967), 386 U. S. 300, 87 Sup. Ct. 1056, 18 L. Ed. 2d 62.

of the police department. There are situations in which a law enforcement officer or even a private citizen may serve with the knowledge and under the direction of a law enforcement agency as such agent. Particularly in the area of enforcing laws against gambling, narcotics and illegal whiskey, individuals, usually enforcement officers, may pose as pseudo-customers giving to a purveyor the opportunity to commit the crime of sale. Short of situations in which entrapment becomes an issue, courts have upheld such giving an opportunity to others to violate the law.[2] In the grim game of apprehending rapists, muggers and strong-arm robbers, individuals have offered themselves as bait, risking their lives to catch dangerous criminals in the act. Because of the hazards involved, such human decoys are invariably law enforcement officers, but courts have upheld such contriving of situations in which criminals may strike again.[3]

Closer to the situation before us, but less than identical, is the undercover agent of a law agency, best described as a feigned accomplice. Such person, almost always a law enforcement officer but on occasion a citizen acting with the advance knowledge of the law enforcement agency, secures acceptance as a member of a criminal gang or subversive organization in order to furnish information on the group's activities to the authorities.

[2] "A suspected person may be tested by being offered opportunity to transgress the law in such manner as is usual in the activity alleged to be unlawful, in which case there is legitimate detection of crime. On the other hand, there is entrapment where law enforcement officers induce persons to violate the law when they would not otherwise do so." 21 Am. Jur. 2d *Criminal Law*, p. 212, sec. 144.

[3] "But where the criminal intent originates in the mind of the accused and the criminal offense is completed, the fact that a person acting as a decoy for the state or public officials furnished the accused an opportunity for commission of the offense . . . constitutes no defense." *Id.* at page 213.

Such undercover agent is, of course, not self-appointed. The book "I Was a Spy for the FBI" by Matt Cvetic, and the television series "I Led Three Lives" by Herbert Philbrick, document the experiences of two such under-cover agents. Obviously, the public purpose to be served is the prevention of crime and apprehension of criminals, as courts have pointed out.[4] Even where the feigned accomplice is a law enforcement officer or one clearly operating with the knowledge and under the direct supervision of a law agency, limits suggest themselves. It would serve the public interest to plant an undercover agent in the midst of criminal conspirators planning the assassination of a public figure to prevent the assassination, but hardly so if the agent were to participate in the assassination attempt even if only for the purpose of later informing authorities of the identity of the actual assassin. There are limits to how far enforcement officers and police undercover agents may go in participating, even as a feigned accomplice, in criminal acts.[5] We do not deal here with such limits. Defendant does not claim that he participated in the store holdup at the direction or even with the advance knowledge of any law enforcement agency.

Actually, the defendant here does not claim that anybody directed or authorized him to participate in the armed holdup of the Lerner store and the trial court did

---

[4] "By the weight of authority, a person who, as a detective, associates with criminals or communicates with or aids them solely for the purpose of discovering commission of crime and procuring the punishment of the criminals is not an accomplice . . . ." 1 Underhill's, *Criminal Evidence* (5th ed.), pp. 342, 343, sec. 175.

[5] "Just how far officers may legally go in their efforts to ferret out those in the business of crime has been a source of considerable concern to this and every other court in the land, but certain general rules based upon sound reason seem to have been evolved." *Aquero v. State* (1957), 164 Tex. Crim. 265, 268, 298 S. W. 2d 822.

not exclude any testimony in this regard related specifically to the May 5, 1964, holdup. He did exclude proffered proof as to earlier occasions on which the defendant claims to have given information to law enforcement agencies, and we think he did so properly.

Counsel for defendant relies heavily on the case of *State v. Reynolds* in which this court "for the limited purpose of showing Reynolds' intent to steal," found admissible evidence of defendant's involvement in a school burglary that had occurred one week before the school break-in with which he was charged.[6] Such authorizing of prior related occurrences was limited in nature. The opinion clearly states: "Evidence may be admitted 'of other occurrences in which a defendant has participated, when such others are similar in facts and close to the time of the offenses for which a defendant is on trial.' "[7]

Defendant's counsel argues now that the converse should also be true. If prior occurrences can be admitted to establish intent, then prior occurrences should be admissible to establish lack of intent. What is sauce for the goose (the state) must also be sauce for the gander (the defendant). There is merit to this contention, except that the conditions come along with the grant-in-aid of admissibility. The prior occurrences must be "similar in facts and close to the time." If there could be any doubt as to the limited nature of what can be admitted in a criminal trial as a "prior occurrence," it vanished with this court's decision in *Whitty v. State.*[8] By unanimous decision, the test as to admissibility of prior occurrences was restated as follows: "We think the admissibility of prior crime evidence does not depend upon admission or conviction for prior criminal conduct but upon its probative value which depends in part upon

---

[6] *State v. Reynolds* (1965), 28 Wis. 2d 350, 137 N. W. 2d 14.

[7] *Id.* at page 357.

[8] *Whitty v. State* (1967), 34 Wis. 2d 278, 149 N. W. 2d 557.

its nearness in time, place and circumstances to the alleged crime or element sought to be proved." [9] Timeliness and similarity of situation are the important factors involved in finding evidence of prior occurrences to be relevant and thus admissible on the question of intent. By being dissimilar in character and circumstances, they fall outside the test of relevancy as not tending in a reasonable degree to establish probability or improbability of a fact in issue. [10]

Putting aside for the moment the apparent remoteness in time of many of the occasions included in the offer of proof, the fact remains that they do not meet the test of similarity. There is no suggestion that at any previous time the defendant had participated in any way on an earlier occasion in the planning or carrying off of an armed holdup with the intent and result of the police being informed of the crime before, during or after its commission. Such a prior occurrence, if not remote in time, would be admissible under the rule in *Reynolds* and *Whitty*. The fact that the defendant gave information to the police as to criminal activities in which he was not involved is not sufficiently similar to a situation in which he is charged with participating in the planning and conducting of an armed robbery. Even if he were a member of a law enforcement force, charged with the same offenses and asserting the same lack of intent as a defense, there would be no materiality to earlier occasions on which he had arrested gamblers, prostitutes or even armed robbers. That he may have given information leading to the arrest of law violators on earlier occasions is equally irrelevant and for the same reason. The prior occurrences are not at all similar in nature.

In excluding the offer of proof as to occasions where the defendant gave information to the police, the trial

[9] *Id.* at page 294.
[10] *Cushman v. Estate of Cushman* (1933), 213 Wis. 74, 76, 250 N. W. 873.

court distinguished sharply between evidence dealing with intent in the particular present situation and evidence dealing with general motivation. We do not quarrel with the concept that it is only what the defendant intentionally did in connection with the armed holdup of the food store that is involved. However, in sustaining the trial court's refusal to broaden the trial to include hearing about dozens at least of earlier information-giving incidents, we place prime reliance upon the fact that the offered proof did not meet the test of relevancy. If the offer of proof were found to be an offer of evidence at all relevant, we would move into the area of trial court discretion. This court has quoted with approval Rule 303 of the American Law Institute Model Code of Evidence providing, in pertinent part, as to discretion of the judge to exclude admissible evidence, that "(1) The judge may in his discretion exclude evidence if he finds that its probative value is outweighed by the risk that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury." [11] On the fact situation here presented, we would find no abuse of discretion, but we do not reach the area of discretion, agreeing with the trial court that the evidence offered was inadmissible as irrelevant.

The issues for the jury were whether or not the defendant had as a matter of objective fact aided the others in the commission of the crimes charged, and whether or not he had intended that his conduct yield such assistance. The jury found that he did so aid and did so intend. The trial judge, at the time of sentencing, stated that he did not believe the testimony of the defendant as to lack of intent. We find no error in the proceedings that resulted in the jury verdict of guilty and the court's imposition of sentence.

*By the Court.*—Judgment affirmed.

---

[11] *Whitty v. State, supra,* at page 294.