STATE of Wisconsin, Plaintiff-Respondent,

v.

Derek ANDERSON, Defendant-Appellant.

Supreme Court

*No. 2003AP3478–CR. Oral argument November 12, 2004.—*
*Decided May 4, 2005.*

2005 WI 54

(Also reported in 695 N.W.2d 731.)

For the defendant-appellant there were briefs by *Neil C. McGinn* and *William J. Tyroler,* assistant state public defenders, and oral argument by *Neil C. McGinn.*

For the plaintiff-respondent the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. JON P. WILCOX, J.    This case comes to us on certification from the court of appeals. The defendant, Derek Anderson, formerly known as Andrew Krnak, appealed an order of the Circuit Court for Jefferson County, William F. Hue, Judge, binding him over for trial for the murder of his father, Allen Krnak. Anderson claimed that the evidence presented at the preliminary hearing failed to establish probable cause for territorial jurisdiction in Wisconsin and venue in Jefferson County.

## I. ISSUES

¶ 2.    The court of appeals certified two questions to this court:    1) Whether the mens rea component of first-degree intentional homicide constitutes a "constituent element" of that crime within the meaning of Wis. Stat. § 939.03(1)(a) (1997–98),[1] such that the state has territorial jurisdiction over a charge of first-degree

---

[1] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated. The criminal complaint alleged that Allen Krnak was murdered in 1998.

111

intentional homicide if an individual commits an act in Wisconsin manifesting an intent to kill; and 2) Whether a Wisconsin county where an act manifesting intent to kill occurred may claim venue under Wis. Stat. § 971.19(2). In addition, the court of appeals noted that the State was challenging an evidentiary ruling made by the circuit court that struck certain hearsay evidence, contending that there was probable cause to establish territorial jurisdiction and venue with this evidence admitted.

¶ 3. We conclude, based on the language of § 939.03(1)(a) and its legislative history, that the mens rea element of first-degree intentional homicide constitutes a "constituent element" under § 939.03(1)(a). Section 939.03(1)(a), which requires that one of the constituent elements of an offense "takes place" in Wisconsin for the state to have territorial jurisdiction, is satisfied upon proof that the defendant committed an act in Wisconsin manifesting an intent to kill. Further, we conclude that the circuit court erred in striking certain hearsay evidence at the preliminary hearing and that with this evidence properly admitted under the residual hearsay exception, the State presented sufficient evidence of venue under Wis. Stat. § 971.19(1) because the State established that there is probable cause to believe that Anderson killed his father in Jefferson County.

## II. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶ 4. Derek Anderson's family—Thomas (his brother), Donna (his mother), and Allen (his father)—disappeared on or around July 2, 1998. They were last seen by Anderson as they were preparing to leave their home in Jefferson County for their cabin in Waushara

County over the Fourth of July holiday. In December 1999, the skeletal remains of Allen Krnak were found in a remote, wooded area of Jackson County, North Carolina. On August 18, 2003, the State filed a criminal complaint against Anderson, charging him with first-degree intentional homicide of his father on or about July 2, 1998, in the town of Sullivan, Jefferson County.[2]

¶ 5.  The preliminary hearing was set for October 6, 2003. Prior to the preliminary hearing, the parties agreed to the following stipulation:

1.  Allen Krnak was the father of the Defendant in the above captioned matter.

    a.  Allen Krnak is deceased.

2.  The Defendant attended Western Carolina University from December 1990 through August 1991.

3.  On July 2, 1998 at 3:10 p.m. a phone call was placed from the Krnak residence on Lundt Road to Allen Krnak's place of employment, Wisconsin Electric Power Company.

The following is a summary of the evidence presented at the preliminary hearing.

¶ 6.  The site where Krnak's remains were found in North Carolina is a national forest, which is located approximately seven to ten miles from Western Carolina University. Anderson had previously attended school here. The cause of Krnak's death was attributed to blunt-force trauma to the head and face.

---

[2] Anderson was initially charged in North Carolina, where his father's skeletal remains were found. Those charges were subsequently dismissed.

¶ 7.   Anderson told law enforcement officials that his parents and brother left their place of residence on July 2, 1998, for their cabin in Waushara County and were due home on Sunday, July 5. Krnak planned to visit a friend and coworker, James Gradel, who owned lake property near the Krnaks' cabin. On July 2, just before he left work for the holiday weekend, Gradel provided Krnak with a hand-drawn map of his property and the surrounding area, as Krnak had never been there. Gradel testified that Krnak placed the map in a briefcase or other carrying device. Gradel testified that Krnak was generally in a good mood that day and was looking forward to a long Fourth of July weekend. Gradel left work around 3:00 or 3:30 p.m. and never saw Krnak again. Anderson told police that his father returned home from work around 4:30 p.m.

¶ 8.   On July 2, 1998, at 3:10 p.m., a phone call was placed from the Krnak residence in Jefferson County to Allen Krnak's place of employment. Anderson initially told police that he did not recall phoning his father at work on July 2, 1998. However, Anderson later informed his aunt that he called his father at work that day because he was at his parents' residence working on his car and needed to find a tool. In addition, Anderson told police that his brother returned home from work between 3:20 and 3:25 p.m. and his mother returned home shortly after 4:00 p.m.

¶ 9.   Another one of Krnak's coworkers, Bill Connelly, testified that he had a conversation with Krnak shortly before 4:00 p.m. on July 2, 1998, and that Krnak seemed "extremely kind of distressed." Connelly testified that he had known Krnak since 1972 and could not remember ever seeing him that upset before. According to Connelly, Krnak told him that "I have to fly out of here" and that "[w]e may have to go to a funeral."

Connelly testified that he recalled that Krnak had an Army buddy who was ill in Minnesota, although he was unclear if that was the reason why Krnak was upset. Krnak was scheduled to leave work at 4:00 p.m.

¶ 10.  During the criminal investigation, Detective Howe of the Jefferson County Sheriff's Department asked Anderson to prepare an activity log to account for his whereabouts over the Fourth of July weekend. The entry in the activity log for Thursday, July 2, indicated that after spending some time at UW-Whitewater, Anderson arrived at his parents' residence at about 4:00 p.m. Anderson stated that when he arrived:

> Tom was working on my computer. Mom got home shortly after I did and started packing for the weekend. I worked on my Mustang for a few hours and then watched TV. Dad got home before 5 and loaded up the truck. Tom grabbed his stuff on the way out the door and drove down the driveway. It was probably 5:15 by now. This was the last I saw of them.

¶ 11.  Anderson indicated that on Friday, July 3, he mainly worked on his car, watched television, and played on his computer. Anderson noted that on Saturday, July 4, he worked on his car, drank alcohol, and watched the fireworks. On Sunday, July 5, Anderson indicated that he worked on his car some more, watched television, made a campfire, and cooked some brats. Anderson stated that his family was "due back before dark but when they didn't show, I just figured they stayed an extra night to fish or something like they sometimes do. They hadn't come home by the time I went to bed around 11:30."

¶ 12.  Anderson indicated that on Monday, July 6, he woke up early because classes were starting and he had a 10:45 a.m. class. He indicated that he noticed that

his family had yet to return home, thought this "was odd," but went to school anyway. Anderson indicated that when he returned home from classes at 4:00 p.m. he began to get worried. He stated:

> Tom wasn't home yet which was strange since he *always* gets home at 3:30. Nothing had changed at home so I started to get worried. Mom and dad didn't get home on time so about 5:00 I drove up to the cabin. I was definitely worried by now since dad always calls if plans change. There wasn't anyone home at the cabin. And I talked to the neighbors . . . . They didn't remember seeing anyone home all weekend. I called the Waushara Co. Sheriff to see if there had been an accident. They had no report and said to check the State Patrol and check with relatives in the area. I also stopped at a deputy's house a mile down the road and asked him to watch for Tom's truck. He hadn't remembered any activity at the cabin for awhile. When I got home I called one of mom's relatives. They hadn't seen anybody so I called the State Patrol. They had no reports of an accident and said to wait. A Jeff. Co. deputy came by Tuesday to check if anyone was home here. I guess Aunt Mary didn't realize I was here.

¶ 13.  On July 10, 1998, Anderson contacted Warden Scott Bowe in Sauk County. He informed Bowe that his parents and brother were missing and needed help locating them. Anderson informed Bowe that his family might have been in the Mirror Lake area scouting hunting ground. Anderson told Bowe that his parents were driving a pickup truck and described the pickup truck. Anderson told Bowe that his family left for their cabin in Waushara County on July 2 and were due home July 5, but he believed that they never made it to their cabin.

¶ 14.  Bowe asked Anderson why he was contacting a conservation warden and Anderson responded

that the sheriff's department was not being helpful.[3] Anderson provided Bowe with a list of possible locations where his family may have gone. Relying on the information provided by Anderson, Bowe located the pickup truck in about 90 minutes in the Dell Creek Wildlife Area in Sauk County. The pickup truck was empty, except for a small notebook on the front seat. Bowe then contacted the Sauk County Sheriff's Department. On July 24, 1998, Anderson met with Bowe and drove around Sauk and Juneau Counties searching for his family.

¶ 15. Detective Howe testified that during his investigation, he spoke with Anderson concerning the mileage on one of the family vehicles. The Krnaks owned a black Chevy pickup truck, a green Ford F-150, and a black Buick sedan. They kept very detailed mileage logs in all three vehicles. On July 21, Detective Howe went to the Krnak residence to obtain the mileage logs on the vehicles and the current mileage figures. The current mileage on the black pickup truck as of July 21 was 127,452. Detective Howe testified that "there was approximately 2,600 miles difference in the mileage that he [Anderson] had given me and the mileage that was written in the book." The last entry date in the mileage log for the black pickup truck was June 24, and at that time the vehicle had 124,834 miles logged. When asked about the excess mileage, Anderson failed to provide an explanation for the large amount of mileage on the vehicle other than stating that he had been driving the vehicle. Another detective testified that the distance between the Krnak residence and the

---

[3] Bowe testified that it is not the responsibility of a warden to investigate missing persons. Bowe's duty area did not include Waushara County.

117

area where Krnak's remains were discovered in North Carolina is approximately 1560 miles round-trip.

¶ 16. Detective Howe also testified that he received a map from the Whitewater Police Department that was recovered from the black Buick owned by Donna Krnak. The vehicle was at the Schopen Wrecker in Whitewater.[4] The map was found in the glove compartment of the vehicle and was sent to the Wisconsin Crime Lab for analysis. The Wisconsin Crime Lab identified Anderson's thumbprint on the map.

¶ 17. Shortly after his family went missing, Anderson phoned his aunt to inquire as to whether they stopped by her place. Although his aunt was very concerned because his parents were very prompt people who were always on time, Anderson told her "[o]h, don't worry." Anderson's aunt testified that during another telephone conversation with Anderson, he informed her that there was a search party at the Krnak residence and stated: "[G]ive them a week and they'll forget this." He also told his aunt: "They will never find them." His aunt also stated that during the conversation "he was very nonchalant." In addition, an acquaintance of Anderson, who attended summer school in Whitewater with him around the time of his family's disappearance, informed police that Anderson told her he was not too concerned about his parents but missed the family dog.

¶ 18. Patricia Ellifson, one of Krnak's coworkers, testified that she had a conversation with Krnak regarding their respective children at work on April 17. She informed Krnak that one of her sons was at college

---

[4] As explained in the State's criminal complaint, Anderson was apparently arrested for operating under the influence in Whitewater, where he attended school, after being involved in an accident while driving his mother's Buick.

and was being very moody. In response, Krnak inquired as to whether Ellifson's son had ever threatened her. Krnak then informed Ellifson that his son had threatened him and had attacked him one night after work. Krnak stated that his son had tried to club him with something and was waiting for him when he came home.

¶ 19. Ellifson stated that it was her understanding that the incident had occurred recently, although Krnak did not specifically state when it occurred. She further stated that Krnak was very upset and frightened when relaying this story. Ellifson stated that Krnak was visibly shaking when he told this story and his face was red. Ellifson herself became upset as a result of this story. When Ellifson asked if he told anybody or was going to do something, Krnak responded: "What's to do. I guess at least you know how you are going out of this world, how you are going to die." Ellifson specifically inquired as to which son Krnak was referring. Krnak stated he was referring to his son Andrew (Derek Anderson).

¶ 20. At the end of the preliminary hearing, the circuit court granted the defendant's motion to strike the testimony of Ellifson as hearsay for the purpose of the preliminary hearing. Nonetheless, the circuit court found that there was probable cause that a homicide occurred and that Anderson committed the homicide. The circuit court also found sufficient evidence for jurisdiction and venue, as it concluded that there was evidence that Anderson formed the intent to kill his father in Jefferson County. The court found that there was an "implication . . . that a scheme was formed to cause Mr. Allen Krnak's death" in Jefferson County. The court stated that the telephone call to Krnak's place of

employment was "part of a scheme to get him to the house for the purpose of causing his demise."

¶ 21. The circuit court clarified that although it found an inference that Anderson formed the intent to kill his father in Wisconsin, it found no evidence that Anderson performed an act in furtherance of that intent in Wisconsin. On December 12, 2003, the circuit court entered a written order binding the defendant over for trial and denying a defense motion to dismiss the criminal complaint. Anderson appealed and the court of appeals certified the aforementioned questions to this court.

## III. STANDARD OF REVIEW

¶ 22. This case concerns whether the State provided sufficient evidence at the preliminary hearing to establish probable cause for jurisdiction in Wisconsin and venue in Jefferson County for the charged offense.[5] Thus, resolution of this case requires an analysis of the statutes governing territorial jurisdiction and venue

---

[5] During a criminal prosecution, the State is required to establish both jurisdiction and venue at trial, although they are not technically elements of a criminal offense. Wisconsin law is clear that the State is required to prove venue beyond a reasonable doubt. *State v. Swinson,* 2003 WI App 45, ¶ 19, 261 Wis. 2d 633, 660 N.W.2d 12 ("[A]lthough venue in Wisconsin must be proved beyond a reasonable doubt, it is not an element of the crime, but rather a matter of procedure, which refers to the place of trial."). Similarly, "the State is obligated in all prosecutions to establish its territorial jurisdiction over a defendant for charged crimes." *State v. Brown,* 2003 WI App 34, ¶ 25, 260 Wis. 2d 125, 659 N.W.2d 110. Territorial jurisdiction is an issue for the jury if it involves unresolved factual disputes; however, whether Wisconsin has jurisdiction under the law for a crime based on an undisputed set of facts is an issue of law for the circuit court. *Id.,* ¶¶ 25–27.

and an inquiry into whether the State's evidence at the preliminary hearing established probable cause that the requirements in those statutes were met.

¶ 23.   We begin by setting forth the rules governing statutory interpretation:

> When interpreting statutes, our goal is to give effect to the language in the statute. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 43, 271 Wis. 2d 633, 681 N.W.2d 110. We begin by looking to the language of the statute because we "assume that the legislature's intent is expressed in the statutory language." *Id.,* ¶ 44. Technical terms or legal terms of art appearing in the statute are given their accepted technical or legal definitions while nontechnical words and phrases are given their common, everyday meaning. Wis. Stat. § 990.01(1). Terms that are specifically defined in a statute are accorded the definition the legislature has provided. *Wis. Citizens Concerned for Cranes and Doves v. DNR,* 2004 WI 40, ¶ 6, 270 Wis. 2d 318, 677 N.W.2d 612. In addition, we read the language of a specific statutory section in the context of the entire statute. *Id.* Thus, we interpret a statute in light of its textually manifest scope, context, and purpose. *Kalal,* 271 Wis. 2d 633, ¶ 48 & n.8.

*Bosco v. LIRC,* 2004 WI 77, ¶ 23, 272 Wis. 2d 586, 681 N.W.2d 157. Therefore, extrinsic sources of interpretation, such as legislative history, are not consulted unless the statute is ambiguous. *Kalal,* 271 Wis. 2d 633, ¶ 46. A statute is ambiguous if reasonably susceptible to being understood in two or more fashions. *Id.,* ¶ 47. Statutory interpretation is an issue of law, reviewed de novo by this court. *State v. Waushara County Bd. of Adjustment,* 2004 WI 56, ¶ 14, 271 Wis. 2d 547, 679 N.W.2d 514.

¶ 24. Next, we review the standards governing probable cause at a preliminary hearing. "[T]he purpose of a preliminary examination is to determine if there is probable cause to believe a felony has been committed by a defendant. Section 970.03(7) then commands the court to bind the defendant over for trial if probable cause is found to exist." *State v. Dunn,* 121 Wis. 2d 389, 394, 359 N.W.2d 151 (1984). "A preliminary hearing as to probable cause is not a preliminary trial or a full evidentiary trial on the issue of guilt beyond a reasonable doubt." *Id.* at 396. "It is intended to be a summary proceeding to determine essential or basic facts as to probability." *Id.* at 396–97. As such:

> The focus of the judge at a preliminary hearing is to ascertain whether the facts and the reasonable inferences drawn therefrom support the conclusion that the defendant probably committed a felony. . . . [A] preliminary hearing is not a proper forum to choose between conflicting facts or inferences, or to weigh the state's evidence against evidence favorable to the defendant. . . . If the hearing judge determines after hearing the evidence that a reasonable inference supports the probable cause determination, the judge should bind the defendant over for trial. Simply stated, probable cause at a preliminary hearing is satisfied when there exists a believable or plausible account of the defendant's commission of a felony.

*Id.* at 397–98.

¶ 25. Thus, the circuit court must "bind a defendant over for trial when there exists a set of facts that supports a reasonable inference that the defendant probably committed a felony . . . ." *Id.* at 398. "All that is needed is a believable or plausible account of the

defendant's commission of a felony." *State v. Cotton,* 2003 WI App 154, ¶ 12, 266 Wis. 2d 308, 668 N.W.2d 346 (citing *Dunn,* 121 Wis. 2d at 398).

¶ 26. When reviewing a circuit court's bindover decision, "we will examine the factual record ab initio and decide, as a matter of law, whether the evidence constitutes probable cause." *Dunn,* 121 Wis. 2d at 399. As such, our review of the circuit court's bindover decision is de novo. *State v. Phillips,* 2000 WI App 184, ¶ 37, 238 Wis. 2d 279, 617 N.W.2d 522. "On review, this court will search the record for any substantial ground based on competent evidence to support the circuit court's bindover decision." *State v. Koch,* 175 Wis. 2d 684, 704, 499 N.W.2d 152 (1993).

## IV. ANALYSIS

¶ 27. Anderson challenges the circuit court's decision regarding bindover, contending that there was insufficient evidence at the preliminary hearing to support territorial jurisdiction in Wisconsin and venue in Jefferson County.

> The term "venue" refers to the locality of the prosecution; venue sets the particular judicial district in which a criminal charge is to be filed and in which it will be tried. Venue is to be distinguished from "jurisdiction," which refers to the authority or power of the court to take action on a particular charge. . . .
>
> . . . To say that the judiciary has such jurisdiction . . . is not to say that every judicial district within that judiciary is a proper locality for the prosecution of the offense.

4 Wayne R. LaFave et al., *Criminal Procedure* § 16.1(a), at 458 (2d ed. 1999).

¶ 28. Section 939.03 sets forth the scope of Wisconsin's territorial jurisdiction:

> (1) A person is subject to prosecution and punishment under the law of this state if:
>
> (a) The person commits a crime, any of the constituent elements of which takes place in this state; or
>
> (b) While out of this state, the person aids and abets, conspires with, or advises, incites, commands, or solicits another to commit a crime in this state; or
>
> (c) While out of this state, the person does an act with intent that it cause in this state a consequence set forth in a section defining a crime; or
>
> (d) While out of this state, the person steals and subsequently brings any of the stolen property into this state.

Wis. Stat. § 939.03. Both parties agree that § 939.03(1)(a) is the applicable statutory provision in this case.

¶ 29. Wisconsin Stat. § 971.19(1) governs venue and states: "Criminal actions shall be tried in the county where the crime was committed, except as otherwise provided." Subsections (2) through (10) of § 971.19 then set forth several exceptions to the above rule. Anderson contends that § 939.03(1)(a) requires the State to prove an actus reus element of the underlying offense occurred in Wisconsin in order for Wisconsin to have jurisdiction over an offense. Specifically, with regard to the charge of first-degree intentional homicide, Anderson argues that the State must demonstrate that the act causing death occurred in Wisconsin. Anderson also argues that the State has failed to establish the requisite proof of venue in Jefferson

County. Anderson asserts that § 971.19(2)[6] is inapplicable because this subsection plainly applies only where an offense contains two or more actus reus elements and a charge of first-degree intentional homicide contains only one actus reus element.

¶ 30. The State, on the other hand, argues that Wisconsin has territorial jurisdiction over a charge of first-degree intentional homicide under § 939.03(1)(a) if it is demonstrated that the defendant formed the intent to kill in Wisconsin and committed one act in furtherance of that intent in Wisconsin. The State contends this standard has been met because the evidence demonstrated that the phone call Anderson made to his father at work on July 2 is an act in furtherance of his intent to kill. Alternatively, the State argues, based on the evidence admitted at the preliminary hearing, that it established probable cause that Anderson killed his father in Wisconsin. The State's final argument with respect to jurisdiction is that the circuit court erroneously struck the testimony of Ellifson, and that with this evidence properly admitted, the State established probable cause that Anderson killed his father in Wisconsin.

¶ 31. With regard to venue, the State argues that an act in furtherance of intent to kill is sufficient to venue a case in the county where such act occurred under § 971.19(2). Alternatively, the State maintains that the evidence submitted at the preliminary hearing was sufficient to establish venue under § 971.19(1) because the evidence was sufficient to support an

---

[6] Wisconsin Stat. § 971.19(2) provides: "Where 2 or more acts are requisite to the commission of any offense, the trial may be in any county in which any such acts occurred."

inference that Anderson actually killed his father in Jefferson County, with or without Ellifson's testimony.

A. Territorial Jurisdiction

¶ 32.   " 'It is elementary that a court may act only upon crimes committed within the territorial jurisdiction of the sovereignty seeking to try the offense.' Without jurisdiction, criminal proceedings 'are a nullity.' " *State v. Randle,* 2002 WI App 116, ¶ 18, 252 Wis. 2d 743, 647 N.W.2d 324 (quoting *Hotzel v. Simmons,* 258 Wis. 2d 234, 240–41, 45 N.W.2d 683 (1951)). As noted, the pertinent provision governing territorial jurisdiction provides that Wisconsin has territorial jurisdiction over a criminal offense if "[t]he person commits a crime, any of the constituent elements of which takes place in this state[.]" Wis. Stat. § 939.03(1)(a). The dispute in this case concerns the meaning of the phrase "any of the constituent elements of which takes place in this state," and whether it is possible and sufficient for purposes of § 939.03(1)(a) to establish that the mens rea element of first-degree intentional homicide "took place" in Wisconsin.[7]

¶ 33.   We begin by addressing the meaning of the phrase "constituent elements." This phrase is a legal term of art, and, as such, we accord it its accepted legal

---

[7] While we ultimately conclude in our venue analysis that the State presented sufficient evidence to establish that Anderson probably killed his father in Jefferson County—thus technically rendering the first certified question a moot point—we nonetheless address the issue of whether intent is sufficient to confer territorial jurisdiction, as this issue was the primary reason the case was certified and it presents a novel question of statewide importance.

definition. "[C]onstituent" is defined as "([o]f a component) that helps make up or complete a unit or a whole." *Black's Law Dictionary* 306 (7th ed. 1999). "[C]onstituent element" is defined as "[a]n essential component of a crime or cause of action." *Id.* at 306. Similarly, the phrase "elements of a crime" is defined as "[t]he constituent parts of [a] crime—usu. consisting of the actus reus, mens rea, and—that the prosecution must prove to sustain a conviction." *Id.* at 538. As such, it is clear that the phrase "constituent elements" refers to those elements that make up the underlying criminal offense. In other words, the "constituent elements" of an offense are those elements of the criminal offense that the State is required to prove beyond a reasonable doubt in the prosecution of the offense.

¶ 34.   Wisconsin Stat. § 940.01 sets forth the crime of first-degree intentional homicide and provides, in pertinent part, that "whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony." Thus, "Wisconsin Stat. § 940.01, first-degree intentional homicide, has two elements:   (1) the causing of death, (2) with intent to kill." *State v. Watkins,* 2002 WI 101, ¶ 59, 255 Wis. 2d 265, 647 N.W.2d 244. The first of these elements is an "actus reus" element, that is, the "wrongful deed that comprises the physical component[]" of the crime of first-degree intentional homicide. *Black's Law Dictionary* 37 (7th ed. 1999). Conversely, the second element is the "mens rea" element of first-degree intentional homicide, that is, "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing [the] crime." *Id.* at 999. *See also Hagenkord v. State,* 100 Wis. 2d 452, 484–85, 302 N.W.2d 421 (1981)("[T]he 'depraved mind' element . . . is

a heinous type of *mens rea* which constitutes a distinct and blameworthy element of three statutory crimes."). Therefore, the crime of first-degree intentional homicide is comprised of two constituent elements: a single actus reus element—the causing of death—and a corresponding mens rea element—with intent to kill.

¶ 35. While it is clear that the phrase "constituent elements" refers to the elements of the underlying offense and that "intent to kill" is a constituent element of first-degree intentional homicide, it is not apparent that an individual's formation of the intent to kill in Wisconsin, in and of itself, is sufficient to confer Wisconsin jurisdiction over a charge of first-degree intentional homicide under § 939.03(1)(a). Although the definition of "constituent element" in § 939.03(1)(a) is clear, that section also requires that at least one of the constituent elements of an offense "takes place in this state" in order for Wisconsin to have jurisdiction over the criminal offense.

¶ 36. The dictionary definition of "occur" is "[t]o take place, come about" or "[t]o be found to exist or appear." *The American Heritage Dictionary of the English Language* 1251 (3d ed. 1992). Likewise, the definition of "exist" is "[t]o continue to be; persist" or "[t]o be present under certain circumstances or in a specified place; occur." *Id.* at 642. Utilizing these definitions, the question then becomes when the mens rea element of a criminal offense can be said to "exist," "be present," or "occur" in this state. We agree with the State that at this point § 939.03(1)(a) becomes ambiguous. As noted *supra*, a statute is ambiguous when it is reasonably susceptible to being understood in two or more fashions. Here, § 939.03(1)(a) is ambiguous as to when the mens rea element of first-degree intentional homicide can be said to "take place" in Wisconsin.

128

¶ 37. Anderson argues that the "intent to kill" element of first-degree intentional homicide cannot "take place" in Wisconsin without the commission of the actus reus element of first-degree intentional homicide in Wisconsin. Anderson notes that the intent to kill element cannot exist apart from the act causing death in order to sustain a conviction for first-degree intentional homicide. Because both elements must occur at the same time, they are "telescoped" into one for purposes of jurisdiction.

¶ 38. In contrast, the State argues that the intent to kill "takes place" in Wisconsin anytime an individual commits an act in furtherance of that intent in this state. In addition, the circuit court offered a third possible interpretation of § 939.03(1)(a). The circuit court essentially concluded that "intent to kill" can be said to "take place" in Wisconsin anytime the State proves that the defendant formed the intent to kill in Wisconsin. That is, according to the circuit court's interpretation of § 939.03(1)(a), the mens rea element of first-degree intentional homicide can be said to "take place" in Wisconsin if there is evidence that the intent to kill "existed" in Wisconsin, even in the absence of an act in furtherance of that intent.

¶ 39. Based upon the above definitions, we conclude that all three of these interpretations are reasonable readings of § 939.03(1)(a) as applied to the crime of first-degree intentional homicide. Because § 939.03(1)(a) is ambiguous as to when the mens rea element of first-degree intentional homicide "takes place" in Wisconsin, we turn to extrinsic sources to guide our statutory interpretation.

¶ 40. The present version of § 939.03(1)(a) was enacted pursuant to Section 1, Chapter 696, Laws of 1955, as part of the wholesale revision of Wisconsin's

Criminal Code. *See Randle,* 252 Wis. 2d 743, ¶ 12 (citing William A. Platz, *The Criminal Code,* 1956 Wis. L. Rev. 350, 350–59). The new criminal code was originally proposed as 1951 Senate Bill 784 and was resubmitted as 1953 Assembly Bill 100 A, which ultimately was enacted into law. William A. Platz, *The Criminal Code,* 1956 Wis. L. Rev. 350, 351. The Wisconsin Legislative Council Judiciary Committee provided comments to both bills. "The language of [§ 939.03(1)(a)] is essentially the same as 1953 Assembly Bill 100 and 1951 Senate Bill 784." *Randle,* 252 Wis. 2d 743, ¶ 12 (citing William A. Platz, *The Criminal Code,* 1956 Wis. L. Rev. 350, 350–59).

¶ 41. Previously, Wisconsin's territorial jurisdiction was divided into two separate statutory sections. Wisconsin Stat. § 353.28 (1953) provided: "Any person who commits an act or who omits to do an act which act or omission constitutes a part of a crime by the laws of this state shall be punished the same as if he had committed the whole of such crime within the state." Additionally, Wis. Stat. § 353.29 (1953) provided:

> Whenever a person, with intent to commit a crime, does any act or omits to do any act within this state in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this state, such person is punishable for such crime in this state in the same manner as if the same had been committed entirely within this state.

¶ 42. As the legislative history of § 939.03(1)(a) indicates, the new provisions on territorial jurisdiction were intended to significantly expand Wisconsin's territorial jurisdiction. The Legislative Council comments to 1951 Senate Bill 784, discussing the revision of Wisconsin's territorial jurisdiction provisions, explain:

This section deals with problems of territorial jurisdiction of the state over persons committing crime. The common law followed the territorial commission principle which, if strictly interpreted, meant that every element of the crime had to occur within the boundaries of the state in order for the state to obtain jurisdiction. . . . [In response], the American states have in effect adopted the territorial security principle, a principle which is based on the theory that a state has sufficient interest in a crime to assume jurisdiction over it if either its commission or its effect takes place within the state boundaries. This section extends the territorial jurisdiction of the state to the limits of the territorial security principle. . . .

Paragraphs (a) and (d) merely restate old law. Paragraphs (b) and (c) extend the jurisdiction of the state, but this does not mean that the state is bound to exercise that jurisdiction in any particular case.

7 Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code* 41 (1950).

¶ 43. Likewise, the Wisconsin Legislative Council comments to 1953 Assembly Bill 100 A provide:

Subsection (1)(a) deals with the situation where part or all of the crime is committed in this state. There is no problem where the whole crime is committed within this state, and *subsection (1)(a) makes it clear that the same rule applies even though only one element of the crime occurs in this state.* Under (1)(a) two states may have concurrent jurisdiction over the same crime.

. . . .

This section extends the state's jurisdiction in accordance with the territorial security principle, a principle which is based on the theory that a state has sufficient interest in a crime to assume jurisdiction over it if either its commission or its effect takes place within

131

the state. . . . Modern criminals have little regard for boundary lines, and the legislatures of most states have found it necessary to extend jurisdiction to crimes which were not wholly committed within the state boundaries. . . .

Sections covered. 353.28 *Part of Crime Punishable Same as Whole Crime* and 353.29 *Part of Crime Committed in This State Same As If All Committed Here* are substantially restated in subsection (1)(a) of the new section. Subsections (1)(b) and (1)(c) of the new section are new law while subsection (1)(d) is a restatement of part of old section 356.01(5).

5 Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code* 3 (1953) (first emphasis added).

¶ 44. In addition, a prominent law review article written shortly after the revision of Wisconsin's criminal code explained the historical significance of the changes to Wisconsin's territorial jurisdiction provisions:

At common law the territorial commission theory of jurisdiction over crimes was uniformly accepted. By application of this theory only that sovereign within whose territorial boundaries a crime was committed could punish for its commission. The locus of the crime was easily fixed if all of its material elements took place in a single jurisdiction.

Cletus D. Howard, Note, *Jurisdiction Over Crimes: Territorial Applicability Provisions of Wisconsin's Criminal Code,* 1956 Wis. L. Rev. 496, 497. Further, the article explains that in response to several difficulties with the stringent common-law rule:

Early statutes were enacted as specific problems arose and out of them grew what is now known as the

132

territorial security principle of criminal jurisdiction. This principle is based on a recognition of the fact that criminal conduct often threatens the security of the state or its citizens regardless of its locus. . . . The territorial applicability provision of the [new Wisconsin] criminal code incorporates the territorial security principle and also some far-reaching extensions of that principle which establish landmarks in criminal jurisdiction.

*Id.* at 498. The article concluded that § 939.03(1)(a) "provides for jurisdiction although the crime is only partially committed within the state." *Id.* at 503.

¶ 45. Based upon the legislative history of § 939.03, we reject Anderson's interpretation of the prerequisites for territorial jurisdiction. While Anderson's argument is facially appealing, his interpretation of § 939.03 is essentially the same as the common-law standard for territorial jurisdiction, which required that every element of the completed offense occur in Wisconsin in order for the state to have jurisdiction over a crime. As indicated by the legislative history of § 939.03, the revised statute pertaining to jurisdiction was clearly intended to broaden Wisconsin's territorial jurisdiction beyond that allowed under the common law and statutes then in existence. Anderson's interpretation of § 939.03(1)(a) would actually render the statute narrower than its predecessors, which allowed for jurisdiction if the defendant committed an act that constituted part of a crime, or if the defendant committed an act in execution or part execution of an intent to commit a crime. Wis. Stat. §§ 353.28, 353.29 (1953).

¶ 46. Furthermore, those who analyzed the revised provisions on territorial jurisdiction agreed that the new § 939.03 conferred jurisdiction to the state over

an offense if part of the offense were to occur in Wisconsin. Section 939.03(1)(a) clearly provides that Wisconsin has jurisdiction over an offense "even though one element of the crime occurs in this state." 5 Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code* 3 (1953).

¶ 47. We conclude that § 939.03(1)(a) is satisfied upon proof that the defendant committed an act in Wisconsin manifesting the intent to kill. Specifically, intent to kill, which is a constituent element of first-degree intentional homicide, may be said to take place —that is, "exist," "occur," or "be present"—in Wisconsin if the defendant commits an act in this state that manifests or exhibits an intent to kill. We reach this conclusion for several reasons.

¶ 48. First, our previous discussion of the legislative history of § 939.03 reveals that the revised statute pertaining to jurisdiction clearly was intended to broaden Wisconsin's territorial jurisdiction beyond that allowed under the common law and statutes then in existence. Under the previous jurisdictional statutes, Wisconsin possessed jurisdiction over an offense "[w]henever a person, with intent to commit a crime, does any act or omits to do any act within this state in execution or part execution of such intent, which culminates in the commission of a crime, either within or without this state[.]" Wis. Stat. § 353.29 (1953). A writer commenting on § 939.03 indicated that "[t]he territorial applicability provision of the criminal code incorporates the territorial security principle and also some far-reaching extensions of that principle which establish landmarks in criminal jurisdiction." Cletus D.

Howard, Note, *Jurisdiction Over Crimes: Territorial Applicability Provisions of Wisconsin's Criminal Code,* 1956 Wis. L. Rev. 496, 498.

■

¶ 49.  Second, § 940.01, which sets forth the crime of first-degree intentional homicide, does not require premeditation or proof of acts committed in preparation for the crime. It contains a single mens rea component:  the existence of intent to kill. Allowing for jurisdiction upon proof of an act committed in this state manifesting an intent to kill is consistent with the normal methods of proof in a trial for first-degree intentional homicide. Unless the State obtains a confession from the defendant indicating that he formed the intent to kill in Wisconsin, it is unlikely that there will be direct evidence of the defendant's intent. When there is no direct evidence of a defendant's intent, *"the defendant's intent is necessarily inferred from the historical facts." Dunn,* 121 Wis. 2d at 399 (emphasis added). Often an act of the defendant that exhibits his intent to kill may be the best circumstantial evidence of such intent.

¶ 50.  Third, this interpretation is consistent with other jurisdictions that have similar territorial jurisdiction statutes and have addressed the issue. *See, e.g., State v. Willoughby,* 892 P.2d 1319, 1324, 1328–29 (Ariz. 1995); *Lane v. State,* 388 So.2d 1022, 1027–29 (Fla. 1980); *State v. Wedebrand,* 602 N.W.2d 186, 189–90 (Iowa Ct. App. 1999); *State v. Lane,* 771 P.2d 1150, 1153–56 (Wash. 1989). All of these courts found that the presence of a mens rea element of a criminal offense, as exhibited by the defendant's conduct in the state, was sufficient to confer jurisdiction to the state over the offense under statutes that allowed for jurisdiction if any element of the crime occurred in the state.

¶ 51. Therefore, we conclude that the phrase "constituent elements" in § 939.03(1)(a) refers to the elements of the underlying offense that the State must prove beyond a reasonable doubt in order to secure a conviction. A constituent element of a criminal offense may be either an actus reus element or a mens rea element. Intent to kill is a constituent element of first-degree intentional homicide in Wisconsin. Thus, intent to kill is a constituent element for purposes of § 939.03(1)(a). Further, we conclude that the State offers sufficient proof that a mens rea element of first-degree intentional homicide "takes place" in Wisconsin for purposes of § 939.03(1)(a), if there is proof that the defendant committed an act in this state that manifests an intent to kill.

¶ 52. While it is unnecessary to apply this standard to the facts of the case in light of our holding below that the State presented evidence that Anderson probably killed his father in Jefferson County, a majority of this court believes that the standard we have articulated above concerning jurisdiction would be met in this case. As discussed *infra,* the evidence presented at the preliminary hearing establishes a reasonable inference that Anderson probably formed the intent to kill his father in Wisconsin and made the phone call to his father at work on July 2. The evidence further creates a reasonable inference that Anderson probably made this phone call for the purpose of luring his father home early in order to murder him. As such, the phone call constitutes an act committed in Wisconsin manifesting Anderson's intent to kill his father. We turn now and address the question of venue.

## B. Venue

¶ 53.  The second question certified by the court of appeals is whether an act committed in a county manifesting an intent to kill is sufficient to establish venue in that county in a prosecution for first-degree intentional homicide under § 971.19(2). As noted *supra,* § 971.19(2) is one of several enumerated exceptions to the general rule in § 971.19(1) that "[c]riminal actions shall be tried in the county where the crime was committed[.]" However, we need not decide whether the evidence presented at the preliminary hearing would satisfy the exception in subsection (2) because we conclude that with the testimony from Ellifson properly admitted, the State proved that there was probable cause to believe that Anderson killed his father in Jefferson County, and thus satisfied the general venue requirement in § 971.19(1).

¶ 54.  The circuit court excluded the testimony of Ellifson only for purposes of the preliminary hearing. The circuit court believed that the State had put forth sufficient evidence to establish venue without the testimony and that therefore it was not necessary to comprehensively examine the admissibility of the Ellifson testimony. Therefore, the circuit court excluded the testimony for purposes of the preliminary hearing but left open the possibility that it could be used at trial. While we appreciate the circuit court's sensitivity to issues of judicial economy, we nonetheless conclude that the Ellifson testimony should have been admitted into evidence. Specifically, we conclude that the testimony of Ellifson, which recounted a conversation she had with Krnak, was admissible under the residual hearsay exception. While Anderson argues that the State

137

waived any claim that this testimony would qualify under the residual exception, this court must "search the record for any substantial ground based on competent evidence to support the circuit court's bindover decision." *Koch,* 175 Wis. 2d at 704.

¶ 55. We begin our analysis by noting that "[t]he rules of evidence apply at a preliminary hearing." *State v. Sorenson,* 143 Wis. 2d 226, 240, 421 N.W.2d 77 (1988). Krnak's statement to Ellifson clearly qualifies as hearsay as it "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Wis. Stat. § 908.01(3) (2003–04).[8] The State argues that this testimony qualifies under the residual hearsay exception because it comes close to qualifying as an excited utterance under Wis. Stat. § 908.03(2), or a statement of recent perception under Wis. Stat. § 908.045(2), and bears comparable guarantees of trustworthiness. Anderson argues that it is inappropriate to admit hearsay under the residual exception if it comes close to qualifying under one of the other enumerated hearsay exceptions but ultimately fails to meet the statutory criteria.

¶ 56. The Wisconsin Rules of Evidence contain two identically worded "residual" hearsay exceptions: Wis. Stat. § 908.03(24) and Wis. Stat. § 908.045(6). Section 908.03(24) applies if the declarant is available to testify whereas § 908.045(6) applies if the declarant is unavailable. However, Wisconsin case law treats the two residuals as equivalents and recognizes there is no

---

[8] Because the preliminary hearing was held in 2003, the references to the evidentiary rules in this section are to the current version of the Wisconsin statutes.

substantive difference between them. *Sorenson,* 143 Wis. 2d at 242, 250 n.9.; *State v. Jenkins,* 168 Wis. 2d 175, 191 n.6, 483 N.W.2d 262 (Ct. App. 1992); Daniel Blinka, 7 *Wisconsin Practice: Wisconsin Evidence* § 803.24, at 682 (2d ed. 2001)[hereinafter *Wisconsin Evidence*]. "The residuals are a compromise between concerns that reliable evidence might be unreasonably excluded by static rules and the law's obsessive fear of hearsay." *Id.*[9]

¶ 57.   Both statutes provide an exception to the hearsay rule for "[a] statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness." Wis. Stat. §§ 908.03(24) & 908.045(6). *See also Sorenson,* 143 Wis. 2d at 242. However, as the declarant, Krnak, is unavailable to testify, we will refer to the exception listed in § 908.045(6).

¶ 58.   This court has previously stated that "the drafters did not intend to restrict the use of the residual exceptions to situations which are completely different from those covered by specifically enumerated hearsay exceptions." *Mitchell v. State,* 84 Wis. 2d 325, 331, 267 N.W.2d 349 (1978). Thus, this court "has specifically

---

[9] As we explained in *State v. Sorenson,* 143 Wis. 2d 226, 242–43, 421 N.W.2d 77 (1988):

> The residual hearsay exception was initially created as part of the Federal Rules of Evidence and adopted in Wisconsin as part of Chapter 908 in 1974. The Federal Advisory Committee Notes, 59 Wis. 2d R301, R302, R323 (1974), explain that it was designed because not every hearsay contingency was anticipated by specific rules. This exception was to provide flexibility needed to permit growth and development in the law of evidence. While not contemplating unfettered judicial discretion, its use was intended to allow admission of evidence under new and unanticipated situations which demonstrate a trustworthiness consistent with that required under other specifically stated exceptions.

rejected the ... argument that the residuals should not be used where the evidence is 'similar' to one of the enumerated exceptions but nonetheless fails to qualify under it[.]" *Wisconsin Evidence* § 803.24, at 683. As we stated in *Mitchell:*

> [W]e cannot accept the ... argument that evidence which is similar to an enumerated hearsay exception cannot be a residual exception under sec. 908.03(24), Stats. On the contrary, since the enumerated hearsay exceptions represent types of evidence traditionally considered to have strong circumstantial guarantees of trustworthiness, hearsay admitted under the residual exception is more likely than not to have close affinities to the exceptions specifically enumerated by the rules.

*Mitchell,* 84 Wis. 2d at 332.

¶ 59.   We agree with the State that while Krnak's statement to Ellifson does not technically qualify as an excited utterance,[10] or statement of recent

---

[10] Section 908.03(2) sets forth the excited utterance exception for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Thus, the excited utterance exception requires three foundational facts:   "1. There was a startling event or condition; 2. The statement related to the startling event or condition; [and] 3. The declarant made the statement while under the stress of excitement caused by the startling event." *Wisconsin Evidence* § 803.2, at 598. While Krnak's proffered hearsay statement clearly satisfies the first two foundational requirements, it fails to satisfy the third requirement.

As we stated in *Christensen v. Economy Fire & Casualty Co.,* 77 Wis. 2d 50, 57–58, 252 N.W.2d 81 (1977), when assessing the third foundational fact:

> [T]iming, the lapse between the triggering event and the utterance is a key factor. ... Under sec. 908.03(2) time is measured by the

perception[11] due to timing problems, it does qualify

> duration of the condition of excitement rather than mere time lapse from the event or condition described. The significant factor is the stress or nervous shock acting on the declarant at the time of the statement. The statements of a declarant who demonstrates the opportunity and capacity to review the [event] and to calculate the effect of his statements do not qualify as excited utterance.

Thus, while the statement need not be contemporaneous with the startling event to qualify as an excited utterance, the statement must be made while the declarant was still under the stress of the startling event, that is, before there has been an opportunity for the excitement and stress of the event to lose its effect. *Id.*

While Ellifson's testimony clearly indicates that Krnak's story related to a startling event and that Krnak was visibly upset when making these statements, we simply do not know when his son's alleged attack occurred, be it a few days or few months earlier. In other words, there is no way of determining whether Krnak's stress at the time of making the statement existed continuously since the time of the alleged attack.

[11] Section 908.045(2) sets forth the statement of recent perception exception for:

> A statement, not in response to the instigation of a person engaged in investigation, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which the declarant was interested, and while the declarant's recollection was clear.

Wis. Stat. § 908.045(2).

"The recent perception exception is similar to the hearsay exceptions for present sense impression and excited utterances, 'but was intended to allow more time between the observation of the event and the statement.' " *State v. Weed,* 2003 WI 85, ¶ 15, 263 Wis. 2d 434, 666 N.W.2d 485 (quoting *Kluever v. Evangelical Reformed Immanuels Congregation,* 143 Wis. 2d 806, 813–14, 422 N.W.2d 874 (Ct. App. 1988)). The purpose of the exception is to " 'admit probative evidence which in most

under the residual hearsay exception because it contains several guarantees of trustworthiness similar to those found in statements admitted under the excited utterance exception. In *Sorenson,* this court discussed the prerequisites to utilizing the residual hearsay exception:

> To apply the residual exception requires establishment of "circumstantial guarantees of trustworthiness" comparable to those existing for enumerated exceptions. Sec. 908.045(6), Stats. The guarantees of trustworthiness which are found in the enumerated hearsay exceptions [are as follows]:
>
> "a. Where the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification be formed;
>
> b. Where, even though a desire to falsify might present itself, other considerations such as the danger of easy detection or the fear of punishment would probably counteract its force;

cases could not be admitted under other exceptions due to the passage of time.'" *Id.,* ¶ 15 (quoting *Kluever,* 143 Wis. 2d at 814). Specifically, the exception " 'is based on the premise that probative evidence in the form of a noncontemporaneous, unexcited statement which fails to satisfy the present sense impression or excited utterance exceptions would otherwise be lost if the recently perceived statement of an unavailable declarant is excluded.'" *Id.* (quoting *Kluever,* 143 Wis. 2d at 814).

Here, while Ellifson's testimony reveals that Krnak's statement describes an event and satisfies most of the limiting factors contained in § 908.045(2), her testimony does not indicate when the event Krnak described occurred, other than that it was her "understanding" that the alleged assault by his son occurred not long ago. As such, there is no basis to conclude that Krnak's statement was made after "recently" perceiving the event.

c. Where the statement was made under such conditions of publicity that an error, if it had occurred, would probably have been detected and corrected."

*Sorenson,* 143 Wis. 2d at 243–44 (quoting 5 Wigmore, *Evidence* § 1423, at 254 (Chadbourn rev. 1974)).[12]

¶ 60.   We conclude that Ellifson's testimony bears sufficient indicia of trustworthiness because "the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification be formed." *Id.* (quoting 5 Wigmore, *Evidence* § 1423, at 254 (Chadbourn rev. 1974)). The testimony at issue here arises from two coworkers who were engaged in an intimate conversation about problems they were experiencing with their adult sons. Krnak revealed a shocking story about a close family member—his son Andrew—who attacked and threatened to kill him.[13] We can find no motive to fabricate based on the nature of this conversation, especially considering the fact that Krnak indicated that he was not going to be contacting the authorities about the assault. His remark about knowing how one was going to die demonstrates his sincerity in making the statement. There is no indication that Krnak was joking when making these comments. Further, the fact that Krnak's statement indicated that it was a close family member who attacked

---

[12] In *Sorenson,* we developed a five-factor test for courts to utilize in analyzing hearsay statements of minors who were the victims of sexual assault under the residual exception. *Sorenson,* 143 Wis. 2d at 245–46. Although this test has been applied beyond the specific facts of *Sorenson,* it has not been extended beyond the context of a minor child's statements concerning abuse. *See State v. Oliver,* 161 Wis. 2d 140, 144, 467 N.W.2d 211 (Ct. App. 1991).

[13] As noted *infra,* the defendant changed his name from Andrew Krnak to Derek Anderson.

him, rather than an unidentified stranger, is significant in that such an allegation might open oneself and his or her family to criticism and/or embarrassment.

¶ 61.  Moreover, Krnak became visibly upset when relating this story, so much so that his face was red and he began shaking. Krnak appeared so distressed that Ellifson herself became upset upon hearing the story. Thus, Krnak was clearly under a great deal of stress when recounting his son's attempt to do away with him. Also of significance is the fact that the conversation between Krnak and Ellifson appears to have been spontaneous, as there is no indication they planned to discuss this topic.

¶ 62.  "The excited utterance exception . . . is based on spontaneity and stress which endow such statements with sufficient trustworthiness to overcome the reasons for exclusion of hearsay." *Christensen v. Economy Fire & Cas. Co.*, 77 Wis. 2d 50, 56, 252 N.W.2d 81 (1977). While Krnak's statement does not technically qualify as an excited utterance because of the lack of evidence regarding when the attack occurred, the statement does demonstrate that it was made spontaneously under a great deal of stress caused by a startling event. The fact that the statement was made under circumstances similar to those forming the basis for the excited utterance exception weighs heavily in favor of its admissibility.

¶ 63.  Therefore, we conclude the testimony offered by Ellifson at the preliminary hearing was admissible under the residual hearsay exception. We further conclude that when this evidence is considered in conjunction with the other evidence presented at the hearing, the State presented sufficient evidence to

create a reasonable inference that Anderson probably killed his father in Jefferson County.

¶ 64. We reiterate that all that is necessary to support a bindover decision following a preliminary hearing is "a believable and plausible account of the defendant's commission of a felony[,]" notwithstanding any alternative explanations the defendant offers for the evidence. *Koch,* 175 Wis. 2d at 706. At this stage in a criminal proceeding, it is not proper to "choose between conflicting facts or inferences, or weigh the state's evidence against evidence favorable to the defendant." *Id.* at 704. All that is necessary is a "set of facts that supports a reasonable inference that the defendant probably committed a felony." *Dunn,* 121 Wis. 2d at 398.

¶ 65. The evidence presented at the preliminary hearing established that Krnak, along with his wife and son, disappeared on July 2, 1998. Krnak's skeletal remains were found at a location in North Carolina that was approximately ten miles from where Anderson had previously attended college. There is no evidence that Krnak planned to visit North Carolina over the Fourth of July weekend. One of the Krnak family pickup trucks had approximately 2600 miles unaccounted for between June 24 and July 2, despite the fact that the Krnaks kept meticulous mileage logs on all of their vehicles. The distance between the Krnak family home and the location of Krnak's remains is approximately 1560 miles round-trip.

¶ 66. This large amount of unaccounted for mileage is consistent with someone making a trip from the Krnak residence in Jefferson County to the place Krnak's remains were ultimately located. When asked by police about the excessive mileage on the vehicle, Anderson provided no explanation other than that he had been driving the vehicle. Given that the Krnaks

145

kept meticulous mileage logs on all their vehicles, Anderson was the only individual with access to the vehicle over the Fourth of July weekend, and Anderson admitted to driving the vehicle, it is reasonable to infer that Anderson himself was responsible for the unaccounted for mileage.

¶ 67. There was evidence that Krnak was in a good mood at work the day of his disappearance until receiving a phone call, which call was traced to the Krnak residence at 3:10 p.m. There was evidence that Anderson probably placed this call. Anderson initially denied making the phone call to police. However, Anderson also told police that his brother returned home from work between 3:20 and 3:25 p.m., his mother returned home shortly after 4:00 p.m., and that he was home when they returned. Therefore, the only person who could have made the call was Anderson. Anderson later admitted to his aunt that he called his father at work to inquire as to the location of a tool that he needed for working on his car.

¶ 68. Krnak was visibly distressed after receiving this call. A coworker, James Connelly, testified that he had known Krnak for over 20 years and had never seen him that upset before. Krnak told Connelly that "I have to fly out of here" and that "[w]e may have to go to a funeral." When Krnak left work that afternoon, shortly before he was scheduled to leave, he was never seen again by any of his coworkers.

¶ 69. Krnak never made it to the family cabin in Waushara County and never visited his friend James Gradel as planned. Anderson's activity log indicated that the neighbors near the family cabin in Waushara County had not seen anyone at the Krnak cabin all weekend. Anderson's activity log for July 2 indicated that he was home when his parents packed up the

pickup truck and prepared to leave. Thus, Anderson was the last person to see his father alive. As apparent from Anderson's activity log for the next two days, Anderson had no alibi for the Fourth of July weekend. The activity log stated that he mainly watched television, worked on his car, and drank at his parents' residence.

¶ 70.   Ellifson's testimony created a reasonable inference that Anderson had previously attempted to kill his father by lying in wait for him when he returned home from work and attempting to club him. While Ellifson's testimony could not be used to directly prove that Anderson acted in conformity with the prior attack on July 2, 1998, it could be used to establish Anderson's intent to kill his father, or the identity of Anderson as the killer. *See* Wis. Stat. § 904.04(2); *State v. Sullivan,* 216 Wis. 2d 768, 783, 576 N.W.2d 30 (1998); *Wisconsin Evidence* § 404.7, at 166.

¶ 71.   Anderson's log for Sunday, July 5, states that his family was "due back by dark but when they didn't show, I just figured they stayed an extra night to fish or something like they sometimes do." However, this statement is inconsistent with the entry for the following day, where Anderson states "dad always calls if plans change." This latter statement is corroborated by the testimony of Anderson's aunt, who testified that the Krnaks were very prompt people who were always on time.

¶ 72.   Despite the fact that his family, who were very prompt people, failed to return home as planned and failed to call to indicate a change of plans, Anderson's log for Monday, July 6, indicated that he went to UW-Whitewater to attend the start of summer school classes. Having returned from classes, he then apparently became worried that his family had not

returned and drove up to the cabin in Waushara County in search of them. Anderson's log indicated that the neighbors near the cabin had not seen anyone at the family cabin all weekend. Anderson then contacted a number of individuals, including law enforcement, to inquire as to his family's whereabouts. One of the individuals he contacted was his aunt. His aunt testified that she expressed concern over the family's disappearance and Anderson responded, "[o]h, don't worry."

¶ 73. Following his family's disappearance, Anderson contacted a conservation warden rather than local law enforcement to assist in the search for his family. The warden was able to locate the Krnaks' vehicle in a large wooded area around Mirror Lake in a relatively short period of time based on the information provided by Anderson. Curiously, despite Anderson's willingness to drive from the Krnak residence in Jefferson County to their cabin in Waushara County, he apparently was unwilling to drive the comparable distance to Mirror Lake to search for his family himself. The Krnaks' pickup truck, which was found near Mirror Lake, was completely empty, despite the fact that Anderson's activity log indicated that his family packed their belongings into the truck and that the neighbors never saw the Krnaks at their cabin.

¶ 74. Krnak did not know the precise location of the cabin of his friend, James Gradel, whom he was supposed to visit and needed Gradel to draw a map to his property. Anderson's fingerprint was found on this map, and the map was found in Whitewater in the glove compartment of his mother's sedan. Anderson's activity log indicated that his family packed up the pickup truck for their vacation. Given the fact that Krnak needed his friend to draw him a map of his property and that Krnak packed his pickup truck, there is a reasonable

inference that Anderson probably took the map from his father and placed it in the sedan, the vehicle he later drove to UW-Whitewater.

¶ 75.   During a conversation with his aunt, when authorities were searching for his family, Anderson told his aunt "[t]hey will never find them." His aunt further testified that in this conversation Anderson was "very nonchalant" about his family's disappearance. In addition to his statements to his aunt, Anderson also made suspicious statements to a fellow student, indicating that he did not really miss his parents but missed the family dog.

¶ 76.   Considering all this evidence together, we believe the State presented sufficient evidence to create a reasonable inference that Anderson probably killed his father in Jefferson County. While admittedly the State's case is entirely circumstantial and there exist reasonable explanations for each of the above items of evidence, the court is not to weigh competing inferences at the preliminary hearing stage. All that is required is a reasonable inference that Anderson probably killed his father and did so in Jefferson County. The evidence creates a reasonable inference that Anderson probably had the intent to kill his father and was most likely his murderer. The evidence creates a reasonable inference that Anderson called his father at work on July 2, 1998, for the purpose of luring him home early in order to kill him. In addition, the evidence creates a reasonable inference that after murdering his father, Anderson probably drove the body to North Carolina and disposed of it close to where he used to attend school.

¶ 77.   The State has presented a plausible account of Anderson's commission of his father's murder, which is all that is required to bind a defendant over for trial. Therefore, we conclude that the State presented suffi-

cient evidence to establish venue in Jefferson County under § 971.19(1). Because the State presented evidence that creates a reasonable inference that Anderson killed his father at his home in Jefferson County, in addition to establishing probable cause for venue under § 971.19(1), the State established probable cause for jurisdiction under § 939.03(1)(a), as the killing of a human being is a constituent element of first-degree intentional homicide.

## V. SUMMARY

¶ 78. We conclude, based on the language of § 939.03(1)(a) and its legislative history, that the mens rea element of first-degree intentional homicide constitutes a "constituent element" under § 939.03(1)(a). We hold that section 939.03(1)(a), which requires that one of the constituent elements of an offense "takes place" in Wisconsin, is satisfied upon proof that the defendant committed an act in Wisconsin manifesting an intent to kill. Further, we conclude that the circuit court erred in striking certain hearsay evidence at the preliminary hearing and that with this evidence properly admitted under the residual hearsay exception, the State presented sufficient evidence of venue under § 971.19(1) because the State established that there is probable cause to believe that Anderson killed his father in Jefferson County.

*By the Court.*—The order of the circuit court is affirmed.

¶ 79. ANN WALSH BRADLEY, J. (*concurring*). I agree with the analysis of the majority concerning territorial jurisdiction and venue. I write separately, however, because of the majority's unnecessary reliance on one of the residual hearsay exceptions. Majority op.,

¶ 3. Unlike the majority, I believe that the evidence at the preliminary hearing established probable cause that Allen Krnak was killed in Jefferson County, even without Patricia Ellifson's testimony.

¶ 80.   As noted by the majority opinion, the circuit court excluded the testimony of Patricia Ellifson only for purposes of the preliminary hearing, leaving open the possibility that it could be used at trial. *Id.,* ¶ 54. The court determined that the State had put forth sufficient evidence to establish venue without the testimony. In its brief, the State agreed with the decision for bindover, submitting that, "even without Patricia Ellifson's testimony, the preliminary hearing established probable cause that Allen Krnak was killed in Wisconsin."

¶ 81.   From the facts of this case, there are two principal reasons to support the circuit court's decision. First, a plausible explanation from the evidence is that Allen Krnak (as well as his wife and son) made it home from work on July 2, 1998, but never left for the family's cabin in Waushara County, despite plans to spend the Fourth of July weekend there. This inference is supported by the discovery of their empty pickup truck in Wisconsin, which contained no personal effects or belongings other than a notebook. Thus, it is plausible that all three Krnaks were killed on that day, after which Anderson dumped his father's body in North Carolina.

¶ 82. Second, the explanation advanced by Anderson—that his father was killed in North Carolina—is also plausible but it relies upon two unlikely sets of circumstances. One is that Allen Krnak voluntarily accompanied Anderson to North Carolina instead of going on vacation with his wife and son. The other is that Anderson kidnapped his father from

Wisconsin, kept him alive until they reached North Carolina, where he then decided to kill him. As the State recognizes, both scenarios conveniently fail to account for the contemporaneous disappearance of Krnak's wife and son.

¶ 83. Two standards of preliminary hearing jurisprudence should guide this analysis. First, if conflicting inferences are equally plausible from undisputed facts, then probable cause for purposes of the preliminary hearing is satisfied. *State v. Dunn,* 121 Wis. 2d 389, 400, 359 N.W.2d 151 (1984). Second, as the majority acknowledges, this court will "search the record for any substantial ground based on competent evidence to support the circuit court's bindover decision." Majority op., ¶ 26 (quoting *State v. Koch,* 175 Wis. 2d 684, 704, 499 N.W.2d 152 (1993)).

¶ 84. If the majority truly employed these standards here, it would not have reached the issue of whether the circuit court erred in striking Patricia Ellifson's testimony. Consequently, it would not have needed to rely on the residual hearsay exception to make that testimony admissible.

¶ 85. The residual hearsay exception should be sparingly used. The necessary indicia of reliability, which is the hallmark of hearsay exceptions, is often more attenuated with the residual exception than with other well-established exceptions. Indeed, unbridled use of the residual hearsay exception may swallow the need for other hearsay exceptions.[1]

¶ 86. Accordingly, I would not have relied upon the residual hearsay exception. Rather, I conclude that

[1] For further discussion of the perils of the residual hearsay exception, see James E. Beaver, *The Residual Hearsay Exception Reconsidered,* 20 Fla. St. U. L. Rev. 787 (1993).

even without the testimony of Patricia Ellifson, the evidence at the preliminary hearing established probable cause that Allen Krnak was killed in Jefferson County. Accordingly, I respectfully concur.

¶ 87.  I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurring opinion.

¶ 88. LOUIS B. BUTLER, JR., J. (*concurring*).  I join the majority opinion with respect to its conclusion that territorial jurisdiction is satisfied in this matter. While I generally agree with the sentiments expressed by Justice Bradley's concurrence that the residual hearsay exception should be sparingly used, Justice Bradley's concurrence, ¶ 85, I nevertheless share the majority's conclusion that Patricia Ellifson's testimony bears sufficient indicia of trustworthiness.[1] Majority

---

[1] Besides objecting on hearsay grounds, Anderson also objected to this testimony as inadmissible "904.04(2) evidence." In other words, Anderson objected to this evidence of other crimes, wrongs or acts as being inadmissible to prove his character in order to show that he acted in conformity therewith, absent a statutorily recognized exception. The majority suggests that this evidence could be used to establish Anderson's intent to kill his father, or the identity of Anderson as the killer. Majority op., ¶ 78. That may or may not be true. The preliminary hearing court chose to disregard Ellifson's preliminary hearing testimony on both hearsay and other acts evidence grounds, and the State has not advanced any arguments as to how the evidence is admissible for other acts purposes.

At trial on remand, the trial court must carefully consider whether the intent exception has been met before admitting her testimony. *See State v. Sullivan*, 216 Wis. 2d 768, 781–93, 576 N.W.2d 30 (1998) (establishing three-step analytical framework to determine admissibility of other acts evidence); *State v.*

op., ¶ 68. I write separately, however, because I do not join the majority's analysis with respect to venue.

¶ 89.   The purpose of a preliminary hearing is to determine whether there is probable cause that a felony has been committed by the defendant. *State v. Dunn,* 121 Wis. 2d 389, 394, 359 N.W.2d 151 (1984). It is a summary proceeding to determine essential or basic facts as to probability. *Id.* at 396–97. Probable cause is satisfied at a preliminary hearing when there exists a believable or plausible account of the defendant's commission of a felony. *Id.* at 398. Thus, the court must bind the defendant over for trial when a set of facts

*Watkins,* 39 Wis. 2d 718, 727, 159 N.W.2d 675 (1968) ("Timeliness and similarity of situation are the important factors involved in finding evidence of prior occurrences to be relevant and thus admissible on the question of intent."); and *Whitty v. State,* 34 Wis. 2d 278, 294, 149 N.W.2d 557 (1967) ("We think the admissibility of prior-crime evidence does not depend upon admission or conviction for prior criminal conduct but upon its probative value which depends in part upon its nearness in time, place and circumstances to the alleged crime or element sought to be proved."). *See also State v. Cartagena,* 99 Wis. 2d 657, 669–70, 299 N.W.2d 872 (1981). The trial court must also establish whether Ellifson's testimony would be admissible to establish identity. *See State v. Scheidell,* 227 Wis. 2d 285, 305, 595 N.W.2d 661 (1999) ("In Wisconsin, the threshold measure for similarity in the admission of other acts evidence with regard to identity is nearness of time, place, and circumstance of the other act to the crime alleged."); *and State v. Kuntz,* 160 Wis. 2d 722, 746, 467 N.W.2d 531 (1991) ("To be admissible for the purpose of identity, the other-acts evidence should have such a concurrence of common features and so many points of similarity with the crime charged that it 'can reasonably be said that the other acts and the present act constitute the imprint of the defendant.' " (citation omitted)). *See also State v. Rushing,* 197 Wis. 2d 631, 647–48, 541 N.W.2d 155 (Ct. App. 1995).

supports a reasonable inference that the defendant probably committed a felony. *Id.*

¶ 90. These principles make it clear that before bindover can be ordered, (1) there must be a reasonable inference, with the operative word being "reasonable," that (2) the defendant probably committed a felony, with the operative word being "probably." While the court does not have to choose between competing inferences, any believable or plausible account of the defendant's "commission of a felony" must necessarily lead to the conclusion that the defendant probably committed a felony. Thus, we must look at the evidence to determine whether it can be reasonably inferred that Anderson probably killed his father in Jefferson County. Probabilities, not possibilities, are what count.

¶ 91. Here is what we know from the preliminary hearing. Allen Krnak, along with his wife Donna and his son Thomas, disappeared on July 2, 1998. Krnak's skeletal remains were found in North Carolina.[2] His wife and son are still missing. The last place Krnak was seen was at the Krnak residence in Jefferson County, and the last person who allegedly saw him alive was Anderson. Shortly before Krnak disappeared, while at work in Waukesha County, Krnak told a coworker that "I have to fly out of here" and that "[w]e may have to go to a funeral." There is no indication of where he would have to fly to, what he meant by that, or where any funeral might be. Krnak was scheduled to leave on vacation to the family cabin in Waushara County, though no one actually saw him there. The Krnaks'

---

[2] *See* Wis. Stat. § 971.19(5) (2003–04), which provides:

(5) If the act causing death is in one county and the death ensues in another, the defendant may be tried in either county. If neither location can be determined, the defendant may be tried in the county where the body is found.

family vehicle was found in a large wooded area around Mirror Lake, which is in Sauk County.

¶ 92. The evidence establishes multiple inferences as to where the homicide occurred. It is entirely possible that the offense was committed in Jefferson County, where Anderson last saw his father alive. It is entirely possible that the offense occurred in Waukesha County, where Krnak's coworker last saw him alive. It is entirely possible that Krnak was killed where the family vehicle was found, in Sauk County. Krnak could have been killed en route to Waushara County, or he may have arrived and been killed there. If Krnak did indeed plan to fly out of the area (that is, actually get on a plane) to go to a funeral, he may have been killed at his arrival location. Krnak's remains were found in North Carolina, another location where he may have been killed. Inferences can be drawn to support the conclusions that the homicide may possibly have occurred in any of these locations. But what makes it "probable" that the homicide occurred in Jefferson County? There is no set of facts that supports a reasonable inference that the defendant probably committed the homicide in Jefferson County. *See Dunn,* 121 Wis. 2d at 398. There is simply no way to tell where Krnak was killed based on the evidence presented.

¶ 93. The legislature has apparently not contemplated a situation where one cannot discern where an offense is committed. This is certainly an area that the legislature should consider in light of the problems created by the facts of this case.[3] The laws that currently exist must, however, be interpreted, considering

---

[3] *See, e.g.,* 4 Wayne R. LaFave et al., *Criminal Procedure,* § 16.1(e), at 487 (2d ed. 1999) (discussing broader legislation that provides that "where an attorney general concludes that an offense was committed somewhere within the state, but 'it is

the legal and practical consequences, to avoid unreasonable and absurd results. *See, e.g., Strenke v. Hogner,* 2005 WI 25, ¶ 48, 279 Wis. 2d 52, 694 N.W.2d 296. It would be unreasonable to interpret the venue statute in a manner that would allow a criminal to escape criminal liability because he or she got rid of the evidence while keeping quiet.

¶ 94. When the evidence adduced at a preliminary hearing fails to establish where a homicide occurred, it is reasonable to presume, in the absence of evidence to the contrary, that the death occurred at the location where the victim was last seen alive. Such a presumption would cover the multiple situations that might occur when a person is kidnapped but never found. It certainly covers the dearth of information as to where the homicide occurred in this case.

¶ 95. Venue is not an element of a criminal offense but refers to the place of trial. *State v. Dombrowski,* 44 Wis. 2d 486, 501, 171 N.W.2d 349 (1969). It is a matter of procedure and designates where the matter should be tried. *Id.* at 502. Nevertheless, on remand, venue must be proved at trial beyond a reasonable doubt. *Id.* While venue may be established by proof of facts and circumstances from which it may be reasonably inferred,[4] such proof must be forthcoming at trial.

---

impossible to determine in which county it occurred, the offense may be alleged in the indictment to have been committed and may be prosecuted . . . in such county as the attorney general designates.' " (citing Mich. Comp. Laws § 762.3 and Mass. Gen. Laws Ann. ch. 227, § 57A; Idaho Code § 19–304(3); Ky. Rev. Stat. § 452.620; Fla. Stat. Ann. § 910.03)).

[4] *See Smazal v. State,* 31 Wis. 2d 360, 363–64, 142 N.W.2d 808 (1966); and *State v. Swinson,* 2003 WI App 45, 261 Wis. 633, 646, 660 N.W.2d 12.

¶ 96. I would conclude that venue is proper in Jefferson County because that is where Krnak was last seen alive.

¶ 97. For the foregoing reasons, I respectfully concur.

¶ 98. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins ¶ 94 of this concurring opinion.