**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 5, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2022AP1826-CR**

Cir. Ct. No. **2022CF79**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT IV**

STATE OF WISCONSIN,

    PLAINTIFF-APPELLANT,

 V.

CARLOS AGUILAR,

    DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for Green County: THOMAS J. VALE, Judge. *Reversed and cause remanded for further proceedings.*

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

¶1     KLOPPENBURG, P.J.  The State filed a complaint alleging that Carlos Aguilar falsely imprisoned A.B., contrary to WIS. STAT. § 940.30 (2021-22).[1]  The State alleged that, during a domestic dispute, A.B. ran away from Aguilar out of their house and was sitting in a car outside their house when Aguilar opened the car door that A.B. had just closed and pulled A.B. by the hair on her head to get her out of the car and to come with him, ripping out clumps of her hair as she resisted.  The circuit court dismissed the complaint, determining that the State failed to present sufficient evidence at the preliminary hearing supporting probable cause to believe that Aguilar committed the crime of false imprisonment.  The State appeals, arguing that the State presented evidence supporting probable cause to believe that Aguilar restrained A.B.'s freedom of movement by "forcibly preventing her from seeking refuge from Aguilar in the parked car during a domestic abuse incident," thereby committing the crime of false imprisonment as defined in § 940.30.

¶2     Aguilar presents two grounds for affirming the circuit court's dismissal of the criminal complaint.  First, Aguilar argues that the State improperly reissued the false imprisonment charge in a new criminal complaint, following the dismissal of that charge after a preliminary hearing in a prior case, without presenting additional evidence at the preliminary hearing in this case as

---

[1] To protect the dignity and privacy of the victim, we refer to her as A.B. and to the witness as C.D., using initials that do not correspond to their real names.  *See* WIS. STAT. RULES § 809.19(1)(g) and 809.86.

WISCONSIN STAT. § 940.30, titled "False imprisonment," provides:  "Whoever intentionally confines or restrains another without the person's consent and with knowledge that he or she has no lawful authority to do so is guilty of a Class H felony."

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

required under WIS. STAT. § 970.04.[2] Second, Aguilar argues that the evidence that the State did present at the preliminary hearing in this case was insufficient to support probable cause to believe that Aguilar committed the crime of false imprisonment as defined in WIS. STAT. § 940.30.

¶3 We conclude that the State did not violate WIS. STAT. § 970.04 in reissuing the false imprisonment charge in a new criminal complaint because: (1) the State presented additional evidence in the form of the responding officer's testimony revising one aspect of the testimony that he gave at the preliminary hearing in the prior case, and body camera footage of his interviews with Aguilar, A.B., and C.D., a witness to the incident, which was not played at the preliminary hearing in the prior case; and (2) that new testimony and footage provided a more detailed description of the incident that constituted new and not merely cumulative or corroborative evidence. This constituted "new evidence" under the applicable case law.

¶4 Separately, we conclude that the State presented sufficient evidence to support probable cause to believe that Aguilar committed the crime of false imprisonment. Specifically, the State presented evidence that Aguilar intentionally restrained A.B. by preventing her from moving her head, without

---

[2] WISCONSIN STAT. § 970.04 provides: "If a preliminary examination has been had and the defendant has been discharged, the district attorney may file another complaint if the district attorney has or discovers additional evidence."

As the State acknowledges, Aguilar may present this argument on appeal without having raised it in the circuit court because he, as the respondent, may present alternative grounds to affirm. *See* *State v. Holt*, 128 Wis. 2d 110, 124-25, 382 N.W.2d 679 (Ct. App. 1985), *superseded on other grounds by statute*, WIS. STAT. § 940.225(7) (1985-86) (ruling that a respondent may raise a theory or reasoning to sustain the circuit court without having first raised the issue in the circuit court).

having her hair ripped out, in any direction but the direction he was pulling her to make her come with him as she resisted his effort to get her out of the car that she had just entered to seek refuge from him. Accordingly, we reverse the circuit court's order dismissing the criminal complaint and remand to the circuit court for further proceedings.

## BACKGROUND

¶5 In a prior case, the State charged Aguilar with the felony offense of false imprisonment and several misdemeanors, including battery, concerning the same incident at issue in this case.[3] At the preliminary hearing in the prior case, the State offered the testimony of the police officer who responded to the incident. The circuit court dismissed the false imprisonment charge, concluding that the State failed to meet its burden of establishing probable cause. The State then reissued the false imprisonment charge in a new criminal complaint. At the preliminary hearing in this case, the State offered testimony of the same officer, who changed a portion of his testimony from the prior preliminary hearing but did not otherwise repeat that testimony, as well as body camera footage of the officer's interviews with Aguilar and portions of the officer's interviews with A.B.

---

[3] The parties refer in their briefing to the pleadings in the prior case brought by the State against Aguilar concerning the incident at issue, based on Wisconsin's CCAP (Consolidated Court Automation Programs) records pertaining to Green County Circuit Court Case No. 2022CF02. CCAP is a case management system provided by the Wisconsin Circuit Court Access program, which "provides public access online to reports of activity in Wisconsin circuit courts." *State v. Bonds*, 2006 WI 83, ¶6, 292 Wis. 2d 344, 717 N.W.2d 133. Because the charges in the prior case are not in the appellate record for this case, we take judicial notice of the CCAP records showing the charges in the prior Green County action, about which there is no dispute by the parties in this appeal. *See* WIS. STAT. § 902.01; *see also State v. Aderemi*, 2023 WI App 8, ¶7 n.3, 406 Wis. 2d 132, 986 N.W.2d 306 (we may take judicial notice of CCAP records); *Kirk v. Credit Acceptance Corp.*, 2013 WI App 32, ¶5 n.1, 346 Wis. 2d 635, 829 N.W.2d 522 (taking judicial notice of CCAP records where the details regarding an action were not in the record).

and C.D. The circuit court dismissed the criminal complaint, again concluding that the State failed to meet its burden of establishing probable cause supporting the false imprisonment charge. The State appeals.

¶6 We present below the details of the evidence presented at each preliminary hearing as pertinent to our analysis of the issues on appeal.

## DISCUSSION

### I. Additional Evidence to Support Reissued False Imprisonment Charge

¶7 We introduce our analysis of the first issue—whether the State could reissue the false imprisonment charge when it had been dismissed after the preliminary hearing in the prior case, based on the evidence presented at the preliminary hearing in this case—with an overview of legal principles pertaining to preliminary hearings and the reissuance of criminal charges. We next present additional facts pertinent to this issue and then apply the legal principles to those facts and explain our conclusion that the State did not violate WIS. STAT. § 970.04 by reissuing the false imprisonment charge here.

### *Applicable Legal Principles and Standard of Review*

¶8 The purpose of a preliminary hearing is for a circuit court to determine if there is probable cause to believe that a felony has been committed by the defendant. WIS. STAT. § 970.03(1). It is not a full evidentiary hearing, but is instead a summary hearing at which the court considers whether the State has presented sufficient evidence establishing a reasonable probability that the defendant committed a felony. *State v. Johnson*, 231 Wis. 2d 58, 64, 604 N.W.2d 902 (Ct. App. 1999). The preliminary hearing acts as a screening device used by the courts to protect defendants from groundless or malicious prosecutions. *State*

*v. Richer*, 174 Wis. 2d 231, 242, 496 N.W.2d 66 (1993); *State v. O'Brien*, 2014 WI 54, ¶21, 354 Wis. 2d 753, 850 N.W.2d 8 (preliminary hearings protect "defendants and the public from unwarranted prosecution [and] serve as a check on prosecutorial discretion").

¶9     When a criminal charge has been dismissed after a preliminary hearing, the State may file a new criminal complaint alleging the same criminal charge against the defendant "if the district attorney has or discovers additional evidence." WIS. STAT. § 970.04; *see also Johnson*, 231 Wis. 2d at 65. The reissuance of the charge in a new complaint is permitted because the dismissal after the preliminary hearing does not have the same constitutional effect, under the Double Jeopardy Clause, as an acquittal after a trial on the merits. *Id.* (citing *State v. Brown*, 96 Wis. 2d 258, 266, 291 N.W.2d 538 (1980)).

¶10     Wisconsin courts have interpreted the "additional evidence" requirement in WIS. STAT. § 970.04 to mean that the prosecution must produce "new or unused evidence" which would support a finding of probable cause. *Johnson*, 231 Wis. 2d at 65. The State's sole argument on this issue is that the prosecution offered "new evidence" at the preliminary hearing in this case, which is evidence that was not before the circuit court in the prior hearing and that is not "merely cumulative or corroborative" of evidence offered at the prior hearing. *Id.* at 68 (citing *Brown*, 96 Wis. 2d at 267).[4] Whether evidence is "new" in the

---

[4] The State does not argue in this appeal that it presented at the hearing in this case "unused evidence," which is evidence that was presented to the circuit court at a prior hearing but which was not considered by it in reaching its decision in the prior hearing. *State v. Johnson*, 231 Wis. 2d 58, 68, 604 N.W.2d 902 (Ct. App. 1999) (citing *State v. Twaite*, 110 Wis. 2d 214, 219-20, 327 N.W.2d 700 (1983)). Therefore, we do not address the "unused evidence" rationale in this opinion.

context of § 970.04 is a question of law that we review independently. *Johnson*, 231 Wis. 2d. at 67-68; *State v. Manthey*, 169 Wis. 2d 673, 683, 487 N.W.2d 44 (Ct. App. 1992).

### *Additional Background*

¶11     The additional background presented here is pertinent to our analysis of both the issue addressed in this section, whether the State reissued the false imprisonment charge consistent with WIS. STAT. § 970.04, and the issue addressed in the following section, whether the State established probable cause.

¶12     At the preliminary hearing in the prior case, the prosecutor elicited the testimony from the officer who responded to the incident involving Aguilar and A.B.  The officer testified that he was dispatched to respond to a "physical domestic" incident and that he spoke with three persons at the scene:  Aguilar, A.B., and C.D.[5]  The officer then testified as to what each of those persons told him.  The officer also testified as to what Aguilar told the officer later the same night at the police station.[6]

¶13     At the preliminary hearing in this case, the prosecutor offered testimony of the same officer who had testified at the preliminary hearing in the prior case, as well as portions of the officer's body camera footage that recorded his interviews with Aguilar, A.B., and C.D. when the officer responded to the

---

[5] For context, we note that the State now asserts, citing the criminal complaint in this case, that C.D. and her husband were living with Aguilar and A.B. at the time of the incident at issue in this case.  Aguilar does not dispute this assertion for purposes of this appeal.  C.D.'s husband and Aguilar are brothers.

[6] We relate pertinent details of the officer's testimony about these statements at the prior preliminary hearing in the analysis that follows.

scene of the incident and his subsequent interview with Aguilar later the same night at the police station.

¶14  The officer testified that, before testifying, he had the opportunity to review the body camera footage of his interactions with Aguilar. Based on that review, the officer changed some of his prior testimony about Aguilar's statements to the officer, clarifying that neither at the scene nor at the police station did Aguilar make any statement to the effect that he did not want A.B. to be in the car because she had been drinking or that Aguilar was concerned that A.B. would drive while impaired.

¶15  The prosecutor also played portions of the body camera footage of the officer's interviews at the scene and at the police station, in part to show that neither Aguilar nor C.D. made any statements to the effect that Aguilar wanted to keep A.B. out of the car or pull her out of the car out of concern that she had been drinking.

¶16  The officer did not repeat any other portions of his prior testimony other than that he responded to the scene of a reported domestic dispute and saw Aguilar by the car's passenger's side door when he arrived at the scene. The officer did not otherwise testify as to what Aguilar, A.B., and C.D. told him beyond responding to questions on cross-examination about some details regarding what was shown in the body camera footage played at the hearing.

¶17  The body camera footage that was played at the hearing of the officer's interview with Aguilar at the scene reflects that he said the following to the officer. Aguilar and A.B. are married and live together, and share one child. After Aguilar and A.B. came home after drinking at a bar, Aguilar told A.B. to come to bed after waiting for an hour for her to join him. When A.B. refused, he

threw her purse outside "out of spite." A.B. became upset and took the keys to the car and ran outside to the car. Aguilar followed her, thinking that she was going to take the car and so he "went after her … took the keys" and "tried pulling her out of the car." Aguilar told A.B., "you cannot be in the car, this is not your car to be taking." When the officer asked Aguilar whether this has happened before, Aguilar said "Not really … not this bad."

¶18 The body camera footage that was played at the hearing of the officer's interview with Aguilar later that night at the police station reflects the following. After the officer read Aguilar the *Miranda* warnings,[7] Aguilar told the officer that he was upset that A.B. refused to come to bed and he and A.B. had been arguing about spending money on Christmas presents while trying to save money to buy a house. When he was trying to get her out of the car by "pulling her by the hair" he "was being aggressive" and he "shouldn't have done what [he] did."

¶19 The body camera footage that was played at the hearing of portions of the officer's interview with A.B. reflects that she said the following to the officer. A.B. was talking with C.D. and C.D.'s husband when Aguilar started yelling at A.B. and calling her names. He started counting to ten and told A.B. that if she did not leave C.D. and her husband and join him she would see what happens. She saw that he had torn apart her purse and dumped its contents and scattered the Christmas presents she had bought for their son. She had "been through this with [Aguilar]" and she knows "how he gets … when he's been drinking." A.B. was scared because Aguilar gets violent when he drinks, and

---

[7] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

because this time was worse than previous times. A.B. gathered the presents and the only car keys she could find, which were the keys to "the new car," and went out to sit in the car to keep herself safe. A.B. got in the car and closed the door, and Aguilar, who had followed her out and taken the keys from her hand before she got in the car, opened the door and grabbed her by her hair to pull her out of the car, ripping out clumps of her hair as he did so. A.B. thought that Aguilar was trying to get her out of the car because he wanted her to come inside the house with him but she did not want to go there. A.B. told Aguilar that she was going to sleep in the car and that she "was going to leave him tomorrow," and she felt that that was "what escalated the situation." A.B. had taken the keys so she could sit in the car to keep herself safe.

¶20   The body camera footage that was played at the hearing of the officer's interview with C.D. reflects that she said the following to the officer. A.B. was sitting in the passenger seat and Aguilar was yelling at her. A.B. was saying "just leave me alone." Aguilar started "pulling on her," with his leg against the car door. A.B. was screaming "help" and C.D. came out and tried to pull Aguilar off A.B. C.D's husband came out and told Aguilar to stop, and Aguilar stopped. A.B. was crying profusely and holding her head and saying that Aguilar ripped chunks of hair out of her head. C.D. then called the police.

*Analysis*

¶21   Aguilar argues that the State improperly reissued the false imprisonment charge without presenting new or unused evidence at the preliminary hearing in this case. Specifically, Aguilar argues that the State's introduction of the officer's body camera footage alongside the officer's testimony did not constitute new evidence within the meaning of WIS. STAT. § 970.04

10

because it was merely cumulative. The State argues that it presented new evidence at the preliminary hearing in this case. We agree with the State.

¶22 As stated, at the preliminary hearing in the prior case, the State offered the testimony of the responding officer who testified about his interviews with Aguilar, A.B., and C.D. At the preliminary hearing in this case, the State offered the testimony of the same officer, who changed one aspect of his testimony at the preliminary hearing in the prior case based on his review of the body camera footage of his interviews with Aguilar, A.B., and C.D. The officer did not otherwise repeat his prior testimony about those interviews. The prosecutor also offered, and the circuit court admitted, the body camera footage itself. The question is whether the testimony by the officer revising his prior testimony and the body camera footage constituted new evidence that was not merely cumulative and, therefore, was additional evidence within the meaning of WIS. STAT. § 970.04.

¶23 "While the concept [of additional evidence] is not self-defining," the following case law involves facts that are useful for comparison to the facts here in providing guidance in defining, as pertinent here, new evidence. *See Wittke v. State ex rel. Smith*, 80 Wis. 2d 332, 344, 259 N.W.2d 515 (1977).

¶24 In *Johnson*, the defendant was charged with robbing a gas station. *Johnson*, 231 Wis. 2d at 60. The State presented two witnesses at the preliminary hearing. First, the State offered the testimony of a gas station attendant who testified that the defendant asked her to open the register and, when she did not respond, he reached his arm back as if to pull out a weapon before grabbing the cash and fleeing. *Id.* at 61. Next, the State offered the testimony of a witness outside the gas station who identified the defendant as the robber. *Id.* After the

defendant successfully argued that the State did not sufficiently demonstrate that he used or threatened force during the robbery, the complaint was dismissed. *Id.* The State then reissued the charge in a new complaint. *Id.* at 62.

¶25 At the preliminary hearing on the reissued charge, the same attendant and witness testified, only this time the attendant offered a more detailed description of the robbery and of the defendant's actions when he asked her to open the register, as well of the difference in physical sizes between her and the defendant. *Id.* at 62-63. The State also offered a new witness who saw the defendant leaving the gas station after the robbery and described his physical size, and another new witness who testified about how the defendant later described his actions during the robbery. *Id.* The defendant again moved to dismiss, arguing that the second preliminary hearing lacked any new or unused evidence, and the circuit court granted the motion, concluding that the State's evidence consisted of only cumulative or corroborative testimony. *Id.* at 64. This court disagreed, reasoning that the new witnesses and the attendant presented more detailed descriptions of the defendant's size and the defendant's words and gestures during the robbery, and that this additional evidence had not been presented in the prior case. *Id.* at 68. This court concluded that because the State offered new, not cumulative, evidence, the State could pursue the reissued charge. *Id.* at 70.

¶26 Here, like the more detailed testimony of the gas station attendant and new witnesses in *Johnson*, the officer's revised testimony and the body camera footage provided a more complete recounting of the events, which was not presented to the circuit court at the preliminary hearing in the prior case. Specifically, the officer's revised testimony and the body camera footage provided a more detailed accounting of the incident and the actions of those involved. This evidence provided additional information potentially bearing on Aguilar's alleged

motivations for seeking to prevent A.B. from sitting in the car, and further context regarding A.B.'s alleged motivations for wanting to sit or remain in the car. To repeat, Aguilar said that he did not want A.B. in his car. A.B. said that, based on her previous experience with Aguilar after he had been drinking and how this time he was even worse, she was scared and she sought refuge from him in the car to keep herself safe. She also said that Aguilar followed her as she ran from the house, took the keys from her before she opened the car door and sat in the passenger seat, opened the car door she had just closed, and pulled her by the hair to get her out of the car. As she resisted, he was ripping out clumps of her hair and she thought he wanted to take her back to the house but she wanted to stay in the car.

¶27 Aguilar argues that the State presented no new evidence at the preliminary hearing in this case as compared to the hearing in the prior case for two reasons: (1) because the same officer testified, leading to the same conclusion of a lack of probable cause by the circuit court; and (2) because the officer's body camera footage was cumulative inasmuch as it showed events about which the officer had testified at the preliminary hearing in the prior case. However, Aguilar disregards the additional details described above, which were not presented at the prior preliminary hearing.

¶28 In addition, some of these details differed from the officer's testimony at that prior hearing. For example, at the prior hearing, the officer testified that A.B. told him that she was trying to sit down in the car when Aguilar pulled her by the hair to get her out of the car. However, in the body camera footage of the officer's interview with A.B., A.B. told the officer that she was sitting in the car and closed the door and Aguilar, who had followed her out and taken the keys from her hand before she got in the car, opened the door and

13

grabbed her by her hair to pull her out of the car, ripping out clumps of her hair as he did so. Also at the prior hearing, the officer testified that C.D. told him she saw A.B. kicking her leg out of the car and trying to stop Aguilar from pulling her hair and pulling her out of the car. However, in the body camera footage of the officer's interview with C.D., C.D. told the officer that it was Aguilar, not A.B., who had his leg against the door while he was pulling A.B. by the hair to get her out of the car. This footage provided a more complete picture of the incident than that provided by the officer's testimony at the prior hearing.

¶29     The case that Aguilar cites in support of his argument, *Wittke*, 80 Wis. 2d 332, is readily distinguishable. In *Wittke*, the defendant was charged with attempted murder after allegedly lunging at officers with a sword. *Id.* at 336. At the first preliminary hearing, the State offered the testimony of two police officers. *Id.* at 337. The circuit court concluded that probable cause was not established and dismissed the complaint. *Id.* The State then filed a new complaint charging the defendant with battery to a peace officer and endangering safety by conduct regardless of life. *Id.* The State stipulated that it had no further testimony to offer other than the cumulative testimony of a third officer at the scene. *Id.* The circuit court discharged the defendant because the new complaint was not supported by new or unused evidence, but only by cumulative or corroborative evidence. *Id.* Our supreme court affirmed, implicitly relying on the State's stipulation that it had no new evidence to present. *Id.* at 344-45. In other words, the court in *Wittke* concluded that offering the same testimony from a different witness does not pass muster as "additional evidence" under WIS. STAT. § 970.04. *Id.*

¶30     In this case, unlike in *Wittke*, neither the officer's testimony at the preliminary hearing in this case nor the body camera footage were simply repetitions of the officer's prior testimony. The officer revised a portion of his

14

prior testimony and testified that the body camera footage provided a more accurate and detailed picture of how Aguilar, A.B., and C.D. described the incident as compared to the officer's prior testimony. Thus, the conclusion in *Wittke* is readily distinguishable.

¶31    In sum, we conclude that the State presented additional evidence pursuant to WIS. STAT. § 970.04, specifically, new evidence that was not merely cumulative or corroborative. Therefore, the State did not violate the statute by reissuing the false imprisonment charge in a new complaint.

## II.    Sufficiency of the Evidence to Show Probable Cause

¶32    The second issue is whether the State presented sufficient evidence at the preliminary hearing to show probable cause to believe that Aguilar committed the crime of false imprisonment. To assist the reader, we briefly summarize the evidence taken from the body camera footage played at the preliminary hearing in this case. Aguilar was yelling at A.B. and tore apart her purse, spilling its contents, when A.B. took the keys to the car and ran out of the house to seek refuge in the car. In addition, there were multiple references to the concept that Aguilar wanted A.B. to be physically with him and not where she wanted to be. A.B. got into the passenger seat of the car and closed the door, where she sought refuge from Aguilar. Aguilar opened the door and grabbed A.B. by her hair to get her out of the car, ripping out clumps of her hair as she resisted. C.D. came outside and unsuccessfully tried to stop Aguilar until C.D.'s husband asked Aguilar to stop and Aguilar let go of A.B.'s hair.

¶33    We begin our analysis with an overview of the legal principles pertinent to establishing probable cause at a preliminary hearing and to statutory interpretation. We then apply those principles to the false imprisonment statute as

15

well as the evidence to reach our conclusion that the State presented sufficient evidence to support probable cause to believe that Aguilar committed the crime of false imprisonment.

### *Applicable Legal Principles and Standard of Review*

¶34 "A defendant charged with a felony is entitled to a hearing pursuant to WIS. STAT. § 970.03 to determine whether there is probable cause to believe that a felony has been committed by that defendant. This hearing is referred to as a preliminary examination." *O'Brien*, 354 Wis. 2d 753, ¶19. If the circuit court concludes that probable cause exists, the court must bind the defendant over for trial. WIS. STAT. § 970.03(7); *State v. Dunn*, 121 Wis. 2d 389, 394, 359 N.W.2d 151 (1984).

¶35 As stated, a preliminary hearing is a summary proceeding to determine whether the evidence and the reasonable inferences drawn from the evidence support the conclusion that the defendant probably committed a felony. *Dunn*, 121 Wis. 2d at 396-98. "The judge is not to choose between conflicting facts or inferences, or weigh the state's evidence against evidence favorable to the defendant." *State v. Koch*, 175 Wis. 2d 684, 704, 499 N.W.2d 152 (1993); *State v. Anderson*, 2005 WI 54, ¶76, 280 Wis. 2d 104, 695 N.W.2d 731 ("[T]he court is not to weigh competing inferences at the preliminary hearing stage."). In other words, "probable cause at a preliminary hearing is satisfied when there exists a believable or plausible account of the defendant's commission of a felony." *Dunn*, 121 Wis. 2d at 398; *O'Brien*, 354 Wis. 2d 753, ¶24 (preliminary hearing is "summary in nature" and its scope "is limited to determining whether the account presented by the State, if believed, has a plausible basis supporting a probable cause determination").

16

¶36     Our supreme court has summarized the applicable standard of review as follows:

> When reviewing a circuit court's bindover decision, "we will examine the factual record ab initio and decide, as a matter of law, whether the evidence constitutes probable cause." *Dunn*, 121 Wis. 2d at 399. [Therefore], our review of the circuit court's bindover decision is de novo. *State v. Phillips*, 2000 WI App 184, ¶37, 238 Wis. 2d 279, 617 N.W.2d 522. "On review, this court will search the record for any substantial ground based on competent evidence to support the circuit court's bindover decision." *State v. Koch*, 175 Wis. 2d 684, 704, 499 N.W.2d 152 (1993).

*Anderson*, 280 Wis. 2d 104, ¶26.

¶37     The crime charged here is false imprisonment, contrary to WIS. STAT. § 940.30, which provides: "Whoever intentionally confines or restrains another without the person's consent and with knowledge that he or she has no lawful authority to do so is guilty of a Class H felony." In order to evaluate whether probable cause exists to believe that Aguilar committed false imprisonment, we must first interpret the false imprisonment statute.

¶38     Statutory interpretation presents a question of law that we review de novo. *State v. Stewart*, 2018 WI App 41, ¶18, 383 Wis. 2d 546, 916 N.W.2d 188. "The purpose of statutory interpretation is to discern the intent of the legislature." *Juneau Cnty. v. Associated Bank, N.A.*, 2013 WI App 29, ¶16, 346 Wis. 2d 264, 828 N.W.2d 262. When interpreting a statute, we start with the statute's plain language, because we assume that the legislature's intent is expressed in the words it used, and we give statutory language "its common, ordinary, and accepted meaning." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶44-45, 271 Wis. 2d 633, 681 N.W.2d 110. "[S]tatutory language is interpreted in the

context in which it is used … and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶46.

### *Analysis*

¶39 Aguilar argues that the State failed to meet two of the elements of the crime of false imprisonment: (1) that Aguilar confined or restrained A.B.; and (2) that Aguilar knew he lacked lawful authority to do so.[8]

### *1. Confinement or Restraint*

¶40 Aguilar first argues that there was not sufficient evidence presented at the preliminary hearing in this case that he confined or restrained A.B. within the meaning of WIS. STAT. § 940.30.

¶41 We first interpret the words "confine" and "restrain" as used in WIS. STAT. § 940.30. Because these words are not expressly defined in that statute, we may refer to their dictionary definitions for their meaning. *See Brown Cnty. Human Servs. v. B.P.*, 2019 WI App 18, ¶12, 386 Wis. 2d 557, 927 N.W.2d 560 ("For the purposes of statutory interpretation, the plain meaning of words may be established by consulting dictionary definitions."). "When a word used in a statute has more than one dictionary definition, 'the applicable definition depends upon the context in which the word is used.'" *Pierce v. American Fam. Mut. Ins. Co.*, 2007 WI App 152, ¶11, 303 Wis. 2d 726, 736 N.W.2d 247 (quoting *Kalal*, 271 Wis. 2d 633, ¶49). Additionally, case law provides useful guidance that "may

---

[8] *See* WIS JI—CRIMINAL 1275 (stating that two of the five elements of false imprisonment are that the defendant confined or restrained the victim, and that the defendant knew that the defendant did not have lawful authority to confine or restrain the victim).

illumine how we have previously interpreted or applied the statutory language" at issue. *Belding v. Demoulin*, 2014 WI 8, ¶16, 352 Wis. 2d 359, 843 N.W.2d 373.

¶42 "Confine" is defined as "to hold within a location" or "to keep within limits." *See, e.g.*, *Confine*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/confine (last visited September 15, 2023); *confine*, THE AMERICAN HERITAGE COLLEGE DICTIONARY, 292 (3d ed. 1993) ("to keep within bounds"). "Restrain" is defined as "to prevent from doing … something" or "to deprive of liberty." *See, e.g.*, *Restrain*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/restrain (last visited September 15, 2023); *restrain*, THE AMERICAN HERITAGE COLLEGE DICTIONARY, 1164 (3d ed. 1993) ("to deprive of freedom or liberty").

¶43 In other words, in the context of WIS. STAT. § 940.30, to "confine" a person refers to keeping that person within defined physical boundaries while to "restrain" a person refers to restricting that person's freedom of movement. The use of "or" in the statute means that either action, confining or restraining, may constitute the crime of false imprisonment. *See Hull v. State Farm Mut. Auto. Ins. Co.*, 222 Wis. 2d 627, 638, 586 N.W.2d 863 (1998) (explaining that "or" should be interpreted disjunctively to indicate alternatives).

¶44 We pause to make two brief observations. First, the label "false imprisonment" could be misleading, to the extent that common notions of imprisonment tend to primarily involve images of confinement. But of course our task is to give meaning to all of the words of the statute, which include both confine and also restrain.

¶45 Second, there is obvious potential overlap between the concept of holding a person within defined physical boundaries and the concept of restricting

19

that person's freedom to move. Often the same act will be both a confinement and a restraint of another. At the same time, however, the legislature has decided to criminalize both acts of confinement (even if the act does not involve restraint) and acts of restraint (even if the act does not involve confinement) and here we are called on to apply the restraint definition.

¶46 The State has brought a "restraint" case here. We conclude that "the account presented by the State, if believed, has a plausible basis supporting a probable cause determination" that Aguilar restrained A.B. in violation of WIS. STAT. § 940.30. *See O'Brien*, 354 Wis. 2d 753, ¶24. According to A.B. and C.D.'s statements to the officer, Aguilar made clear that he wanted A.B. to be physically present with him. When she went out to the car, he went after her. After A.B. got into the car and was sitting in the car's passenger seat, Aguilar opened the car door and grabbed her hair, ripping out some of it, to get her out of the car to come with him, as she resisted because she wanted to stay in the car. It can be inferred from the evidence that Aguilar grabbed A.B. by her hair so forcefully that he restricted her freedom to move her head, without losing clumps of her hair, in any direction that would resist his efforts to get her out of the car and to come with him. Therefore, there is a plausible probability that Aguilar restricted A.B.'s freedom of movement and, thus, restrained her in violation of WIS. STAT. § 940.30.

¶47 Aguilar argues that he never restricted A.B.'s movement but, at most, he attempted to compel her movement. To the contrary, as explained above, the evidence presented by the State plausibly shows that he restricted her freedom to move her head in any direction but the direction he was pulling her, so as to resist his efforts to get her out of the car and to resist his efforts to have her physically with him, before he released her when C.D.'s husband told him to stop.

¶48     Aguilar argues that to be charged with false imprisonment under WIS. STAT. § 940.30, a person must confine or restrain the victim so that the victim is held or kept in a specific location and that false imprisonment "requires intentional and nonconsensual confinement".  However, the case law on which Aguilar relies does not support this proposition.

¶49     Aguilar cites *State v. Burroughs*, 2002 WI App 18, ¶19, 250 Wis. 2d 180, 640 N.W.2d 190, as support for the assertion that the crime of false imprisonment requires confinement, but he mischaracterizes *Burroughs*.  In that case, this court considered whether the defendant had confined the victim within the meaning of the kidnapping statute.  *Id.*, ¶16.  Noting that neither the statute nor the model jury instructions define the term "confine" for purposes of the kidnapping statute, the court turned to the false imprisonment statute for guidance.  *Id.*, ¶17-18.  Aguilar directs our attention to the following language in the court's analysis:  "At the core, both [kidnapping and false imprisonment] require nonconsensual and intentional confinement."  *Id.*, ¶19.  However, the surrounding context clarifies that the *Burroughs* court did not conclude that the "or restrains" language in the false imprisonment statute requires the act of confining the victim.  Instead, the court continued by noting that "kidnapping also requires certain accompanying circumstances:  force or threat of force together with secret confinement, secret imprisonment, asportation out of this state, or holding for service against the victim's will."  *Id.*  This additional language makes clear that the court was merely describing a baseline similarity between the two statutes— that both statutes criminalize confinement—and explaining that the type of confinement necessary to constitute kidnapping requires more than the type of confinement that would support a false imprisonment charge.  The *Burroughs*

court simply did not address the part of the false imprisonment statute that criminalizes restraint.

¶50 Aguilar also cites *Herbst v. Wuennenberg*, 83 Wis. 2d 768, 774, 266 N.W.2d 391 (1978), to support the assertion that restraining the physical liberty of another is false imprisonment only when it is coupled with some element of confining or restraining the victim to a specific location. As Aguilar recognizes, however, *Herbst* is a civil case that adopts the definition of false imprisonment in the RESTATEMENT (SECOND) OF TORTS, which requires confinement of the victim "within boundaries fixed by the actor." *Herbst*, 83 Wis. 2d at 774. Moreover, subsequent cases citing *Herbst* in the criminal context have, like *Burroughs*, focused on the part of the false imprisonment statute that penalizes confinement. *See Burroughs*, 250 Wis. 2d 180, ¶¶18-19 (comparing the element of confinement in the false imprisonment and kidnapping statutes); *State v. Long*, 2009 WI 36, ¶¶27-28, 317 Wis. 2d 92, 765 N.W.2d 557 (concluding that the defendant confined the victim by hugging the victim tightly and forcibly without letting go). Neither case addresses the "or restrains" language in WIS. STAT. § 940.30.

¶51 We note that the court in both *Burroughs*, 250 Wis. 2d 180, ¶18, and *Long*, 317 Wis. 2d 92, ¶28, relied on *Herbst* to define confinement within the meaning of the false imprisonment statute as "restraint by one person of the physical liberty of another," which is similar to the definition of restraint that we have derived above from dictionary definitions as "restriction of a person's freedom of movement." In the two of these three cases that applied that definition under the false imprisonment statute, the definition of confinement includes the further qualification in *Herbst* that such "restraint" be "within boundaries fixed by the actor." *Herbst*, 83 Wis. 2d at 774; *see Long*, 317 Wis. 2d 92, ¶¶27-28. Aguilar cites no legal authority applying that qualification regarding the definition

of confinement—restriction of movement within boundaries set by the actor—to the definition of restraint under WIS. STAT. § 940.30. That is, Aguilar cites no legal authority which requires that the restraint penalized in § 940.30 can only be, as he asserts, restraint of movement within a specific location.

¶52    Aguilar also argues that defining the crime of false imprisonment to include any situation in which the defendant restricts the victim's physical liberty, even if it is not accompanied by confinement to a bounded area, would be a dangerous extension of prior rulings. We reject this argument because it disregards the specific evidence here and the narrow question at issue. The issue is not whether the evidence that was presented at the preliminary hearing in this case proved beyond a reasonable doubt that Aguilar committed false imprisonment. That will be for a factfinder to decide based on whatever the trial evidence might be. The issue is whether the evidence at the preliminary hearing plausibly shows probable cause to believe that Aguilar committed a felony. We agree with the State that the evidence here—that Aguilar made clear that he wanted A.B. to be with him, followed A.B. out to the car, took the keys from her hand, opened the car door that she had just closed from the inside, and in a sustained manner pulled her by the hair to get her out of the car and to be with him so violently that he ripped out clumps of her hair as she was resisting—plausibly shows that Aguilar restricted A.B.'s freedom of movement without having her hair ripped out. That is, Aguilar prevented her from moving her head in any direction, without having her hair ripped out, other than the direction he was pulling her to make her come with him, as she resisted his effort to get her out of the car that she had just entered to seek refuge from him. This evidence establishes probable cause to believe that Aguilar restrained A.B. contrary to WIS. STAT. § 940.30.

23

¶53   Aguilar sets forth several hypothetical scenarios in support of his "dangerous extension" argument. Specifically, he argues that if the statute is interpreted to prohibit restraint that does not involve confinement within bounds set by the defendant, the denial of access to property jointly owned by spouses would amount to false imprisonment in the following hypotheticals involving spouse A and spouse B: (1) A locks B out of a portion or all of their residence; (2) A pulls B off A's favorite recliner so that A can watch television from that chair; (3) A pushes or pulls B out of their marital residence; (4) A pulls B out of the bathroom in the marital home; (5) A grabs B's arm and takes away the phone or other item of personal property. To the extent that these hypotheticals, specifically numbers 3 and 4, were to involve evidence that one spouse was taking refuge or attempting to take refuge from the other spouse (that is, trying to be physically apart from the other), Aguilar does not explain why it would be "dangerous" to conclude that this might constitute unlawful restraint under WIS. STAT. § 940.30 for purposes of establishing probable cause. The legislature has selected a broad term, restraint, and it would be for the legislature to narrow the wording of the statute. More generally, to the extent that these scenarios lack the surrounding context that exists in this case—the use of violent force to attempt to deprive A.B. of the liberty to be in a location physically apart from Aguilar—they are not apposite.

¶54   In sum, we conclude that the evidence presented at the preliminary hearing in this case established probable cause to believe that Aguilar restrained A.B. contrary to WIS. STAT. § 940.30.

## 2. *Knowledge of Lack of Lawful Authority to Restrain*

¶55     Aguilar argues that the State did not present evidence sufficient to establish probable cause to believe that Aguilar had knowledge that he lacked lawful authority to try to get A.B. out of the car by pulling her by the hair so violently that he restricted her movement, as is required under WIS. STAT. § 940.30 ("Whoever intentionally confines or restrains another without the person's consent and with knowledge that he or she has no lawful authority to do so is guilty of a Class H felony."). We conclude that the record refutes this argument.

¶56     Aguilar himself told the officer, "I was being aggressive. I shouldn't have done what I did, I know." And, he stopped attacking A.B. only after C.D.'s husband asked him to do so. Aguilar's admission and his conduct suffice to support probable cause to believe that Aguilar acted with knowledge that he lacked legal authority to violently restrain A.B. contrary to WIS. STAT. § 940.30. *See State v. Teynor*, 141 Wis. 2d 187, 207, 414 N.W.2d 76 (Ct. App. 1987) (Evidence of a defendant's admissions and conduct can be used to support an inference that the defendant knew the defendant was without lawful authority to confine or restrain the victim.).

¶57     Aguilar argues that the only evidence was that he was pulling A.B. to get her out of the car because he did not want her to be inside the car because it was his car. Aguilar told the officer, "I thought she was taking the car … I'm like, do not take my car …. It's not yours, it doesn't belong to you, you can't just take it wherever you want." However, even if he thought he had legal authority to keep A.B. from driving the car because it was his, there was also evidence that, before he violently grabbed A.B. by the hair to pull her out of the car, he had taken the

25

keys away from her. Thus, at that point, she was not able to "take" the car, thereby undermining his asserted legal authority to keep her from driving "his" car. Aguilar does not identify any other legal authority that he thought he had, or that he did have, to restrain A.B. by violently grabbing her by the hair to prevent her from moving so as to resist him and his efforts to have her be physically with him.

¶58     In sum, we conclude that the evidence presented at the preliminary hearing established probable cause to believe that Aguilar restrained A.B. with knowledge that he had no lawful authority to do so.

## CONCLUSION

¶59     For the reasons stated, we conclude that the State presented sufficient evidence to establish probable cause to believe that Aguilar restrained A.B. in violation of WIS. STAT. § 940.30. Accordingly, we reverse the circuit court's dismissal of the complaint and remand to the circuit court for further proceedings.

    *By the Court.*—Order reversed and cause remanded for further proceedings.

    Not recommended for publication in the official reports.